# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 JUN 27  AM 11: 16

DEPUTY CLERK_____

NATIONAL FEDERATION OF )
INDEPENDENT BUSINESS, a )
California non-profit mutual )
benefit corporation, )
 )
TEXAS ASSOCIATION OF BUSINESS, )
a Texas non-profit organization, )
 )
LUBBOCK CHAMBER OF )
COMMERCE, a Texas non-profit )
organization )
 )
NATIONAL ASSOCIATION OF HOME )
BUILDERS, a Nevada non-profit )
corporation, and )
 )
TEXAS ASSOCIATION OF BUILDERS, )
a Texas non-profit organization, )
 )
                Plaintiffs )
 )
and )
 )
STATE OF TEXAS )
STATE OF ARKANSAS )
STATE OF ALABAMA )
STATE OF INDIANA )
Attorney General Bill Schuette on )
  behalf of the PEOPLE OF MICHIGAN )
STATE OF OKLAHOMA )
STATE OF SOUTH CAROLINA )
STATE OF UTAH )
STATE OF WEST VIRGINIA )
STATE OF WISCONSIN )
 )
        Intervenor-Plaintiffs, )
 )
v. )    CIVIL ACTION NO. 5:16-cv-00066-C
 )
THOMAS E. PEREZ, in his official )
capacity, Secretary, United States )
Department of Labor, )

MICHAEL J. HAYES, in his official )
capacity, Director, Office of Labor- )
Management Standards, United States )
Department of Labor, and )
)
UNITED STATES DEPARTMENT )
OF LABOR )
)
     Defendants. )

## PRELIMINARY INJUNCTION ORDER

## TABLE OF CONTENTS

I. FINDINGS OF FACT .................................................................................................... 2

    A.    Expert witnesses................................................................................................. 2

    B.    Union campaigns and the role of attorneys representing employers ...................... 5

    C.    The American Bar Association's opposition to DOL's New Rule as conflicting with attorneys' ethical duties............................................................. 11

    D.    The New Rule's threat to employers' access to legal and other advice................ 15

    E.    DOL's New Rule's negative impact on the Lubbock Chamber, TAB, and their member-employers ................................................................................... 16

    F.    The New Rule's negative impact on NFIB and its member-employers ............... 19

    G.    The New Rule's negative impact on small employers........................................ 23

    H.    The costs of compliance with the New Rule ...................................................... 25

II. CONCLUSIONS OF LAW........................................................................................... 27

    A.    Legal Background ........................................................................................... 27

        1.    The LMRDA's disclosure requirements and the Advice Exemption ....... 27

        2.    DOL's New Rule interpreting the Advice Exemption.............................. 33

        3.    DOL's Special Enforcement Policy........................................................ 39

        4.    The Association-Plaintiffs' standing....................................................... 40

        5.    Evidence outside the administrative record ............................................. 41

    B.    Plaintiffs and Intervenor-Plaintiffs are entitled to a preliminary injunction......... 44

        1.    Plaintiffs and Intervenor-Plaintiffs have shown a substantial likelihood of success on the merits. ....................................................... 45

            a.    Plaintiffs and Intervenor-Plaintiffs will likely succeed on their claim that DOL lacks statutory authority to

promulgate and enforce its new Advice Exemption
Interpretation [1]. ........................................................... 45

b.     Plaintiffs and Intervenor-Plaintiffs will likely succeed on
their claim that DOL's new Advice Exemption
Interpretation is arbitrary, capricious, and an abuse of
discretion. ...................................................................... 51

c.     Plaintiffs and Intervenor-Plaintiffs will likely succeed on
their claim that the DOL's new Advice Exemption
Interpretation violates free speech and association rights
protected by the First Amendment. ................................. 56

d.     Plaintiffs and Intervenor-Plaintiffs will likely succeed on
their claim that DOL's new Advice Exemption
Interpretation is unconstitutionally vague in violation of the
due process clause of the Fifth Amendment. ................. 64

e.     Plaintiffs and Intervenor-Plaintiffs will likely succeed on
their claim that DOL's new Advice Exemption
Interpretation violates the Regulatory Flexibility Act
(RFA). ............................................................................. 68

2.     Plaintiffs and Intervenor-Plaintiffs have shown a substantial threat
of irreparable harm. .................................................................. 71

3.     The balance of hardships weighs in Plaintiffs' and Intervenor-
Plaintiffs' favor. ....................................................................... 82

4.     The issuance of the preliminary injunction will not disserve the
public interest. .......................................................................... 83

C.     A nationwide injunction is appropriate. ............................................. 83

ORDER GRANTING INJUNCTIVE RELIEF ......................................................... 85

---

[1] *Labnet Inc. v. United States Dept. of Labor*, No. 16-CV-0844, 2016 U.S. Dist. LEXIS 81884, ECF No. 61 (D.Minn. June 22, 2016) is discussed in detail on pp. 45-46, 66-67, and 82 n. 1.

## PRELIMINARY INJUNCTION ORDER

Plaintiffs National Federation of Independent Business ("NFIB"), Texas Association of Business ("TAB"), Lubbock Chamber of Commerce ("Lubbock Chamber" or "Chamber"), National Association of Home Builders ("NAHB"), and Texas Association of Builders ("Texas Builders") (collectively, "Plaintiffs") filed their Complaint for Declaratory Relief and Application for Preliminary Injunction and Permanent Injunction on March 31, 2016. Dkt. 1.

Intervenor-Plaintiffs State of Texas, State of Arkansas, State of Alabama, State of Indiana, Attorney General Bill Schuette on behalf of the People of Michigan, State of Oklahoma, State of South Carolina, State of Utah, State of West Virginia, and State of Wisconsin ("Intervenor-Plaintiffs" or the "States") filed their Complaint in Intervention and Application for Preliminary Injunction on May 19, 2016. Dkt. 49.

Plaintiffs and Intervenor-Plaintiffs name the following persons and/or entities as the Defendants:  Thomas E. Perez, in his official capacity, Secretary, United States Department of Labor; Michael J. Hayes, in his official capacity, Director, Office of Labor-Management Standards, United States Department of Labor; and United States Department of Labor (all collectively, "DOL").

Plaintiffs and Intervenor-Plaintiffs seek a preliminary injunction barring implementation and enforcement of DOL's new rule entitled "Interpretation of the 'Advice' Exemption in Section 203(c) of the Labor-Management Reporting and Disclosure Act" (hereafter, the "New Rule" or the "Advice Exemption Interpretation"), 81 Fed. Reg. 15,923 (Mar. 24, 2016).  No Defendant has moved for dismissal based on lack of jurisdiction over their persons, insufficiency

of process, insufficiency of service of process, lack of standing, or failure to join a necessary party.

On the 20th day of June, 2016, came on for hearing Plaintiffs' and Intervenor-Plaintiffs' Applications (Motions) for Injunctive Relief in the above-styled and-numbered cause. All parties appeared and announced ready.

The Court heard evidence from eight (8) witnesses for Plaintiffs and Intervenors and admitted various documentary exhibits into the record. Defendants called no witnesses and introduced no exhibits into the record. Thus, the witness testimony and documentary evidence presented by Plaintiffs is uncontroverted. Based upon the evidence adduced, the Court makes the following findings of fact:

## I.  FINDINGS OF FACT

At the hearing, the Court heard testimony from the following witnesses, and the Court finds the following facts based upon their testimony and the exhibits admitted into evidence in connection with such testimony:

**A.    Expert witnesses**

1.      David P. Hiller is a partner at the law firm Fisher & Phillips, LLP.  Mr. Hiller received his law degree in 1969 from the University of Michigan Law School.  Since 1983, his law practice has been devoted to representing management in labor relations matters, including responding to union election campaigns, negotiating collective bargaining agreements, defending unfair labor practice charges, advising regarding plant closures or relocations, and advising regarding the purchase of unionized facilities.  Mr. Hiller practices in Columbus, Ohio.[2]  Tr. (Hiller) at 29-32.

---

[2] The Court finds that Mr. Hiller is qualified as an expert witness pursuant to Federal Rule of

2.     Dennis Duffy is a partner at the law firm of BakerHostetler.  Mr. Duffy received his law degree from the University of Virginia Law School in 1982.  He is Board Certified by the Texas Board of Legal Specialization in the area of labor and employment law and a recognized expert in attorney ethics, particularly in labor and employment matters.  Mr. Duffy is the author of *Ethics and Professionalism Handbook for Labor and Employment Lawyers*, 14th Ed. (2016).  Mr. Duffy practices in Houston, Texas.  Tr. (Duffy) at 95-98.

3.     Over his career, Mr. Duffy has served in positions at multiple law firms, as in-house counsel, and as a law professor, including Vice President and Associate General Counsel and Chief Counsel for Time Warner, Inc., General Counsel for the University of Houston, Professor of Law at the University of Houston, and Visiting Professor of Law at the University of Virginia.  Mr. Duffy's law practice is presently devoted to labor and employment counseling.  Tr. (Duffy) at 96-97; Pls.' Ex. 40. [3]

---

Evidence 702 to testify regarding the practice of labor law, including employer and lawyer practices in responding to union organizing campaigns and the effect of DOL's new disclosure requirements on those practices.

[3] The Court finds that Mr. Duffy is qualified as an expert witness pursuant to Federal Rule of Evidence 702 to testify regarding legal ethics, the interpretation and operation of the rules of professional conduct, and the impact of DOL's New Rule on the ethical obligations of attorneys promulgated by Intervenor-Plaintiffs and all States.

4.      William T. Robinson is a partner with the law firm Frost Brown Todd. Mr. Robinson received his law degree in 1971 from the University of Kentucky College of Law. Mr. Robinson has practiced law since 1971 and is admitted to the bars of Kentucky, Ohio, and Tennessee. Mr. Robinson's legal practice focuses on commercial and civil litigation. Tr. at 154. Additionally, he has represented lawyers in matters involving alleged ethical violations. Mr. Robinson practices in Northern Kentucky and Cincinnati, Ohio. Tr. (Robinson) at 154, 159.

5.      Mr. Robinson has been closely involved with the Kentucky Bar and American Bar Association ("ABA") as well as specialty bar associations for many years. He has served in various capacities with the bar associations, including as President of the Kentucky Bar Association and on the ABA House of Delegates, Board of Governors, and as Treasurer. Mr. Robinson also has served on the adjunct faculty of the Salmon P. Chase College of Law. Tr. (Robinson) at 153.

6.      Currently, Mr. Robinson serves as Chair of the Board of Directors of the National Judicial College. From 2011 to 2012, Mr. Robinson served as the President of the ABA. He has been in the leadership of the ABA and on ethical programs and has remained very familiar with the ABA Model Rules of Professional Conduct. The ABA's President has sole authority to speak on behalf of the ABA on matters of interest to the bar association. Tr. (Robinson) at 156, 159, 165, and 167. [4]

7.      Ronald Meisburg is Senior Counsel at the law firm Hunton & Williams LLP. Mr. Meisburg received his law degree in 1974 from the Louis D. Brandeis School of Law,

---

[4] The Court finds that Mr. Robinson is qualified as an expert witness pursuant to Federal Rule of Evidence 702 to testify regarding the ABA's position on the ethical implications of the DOL's New Rule, including in light of the ABA's Model Rules of Professional Conduct.

University of Louisville.  Over his career, Mr. Meisburg has focused his law practice on labor law.  Mr. Meisburg currently practices in Washington, D.C.  Tr. (Meisburg) at 197-98.

8.      Mr. Meisburg began his career with the Office of the Solicitor of the U.S. Department of Labor.  Following a period in private practice, Mr. Meisburg was appointed by President George W. Bush in 2004 to the NLRB.  Two years later, President Bush appointed Mr. Meisburg to a four-year term as the NLRB's General Counsel.   In that role, Mr. Meisburg served as the chief prosecutor under the NLRA and as chief administrator of the NLRB's 32 regional offices. Tr. (Meisburg) at 198-99.[5]

**B.      Union campaigns and the role of attorneys representing employers**

9.      The NLRB is responsible for overseeing union elections.  The NLRB conducts about 2,600 elections annually.  The DOL does not oversee any union elections.  Tr. (Hiller) at 34-35.

10.      Unions typically employ professional organizers, who begin organizing efforts without an employer's knowledge.  Union organizers attempt to gain employee signatures on authorization cards.   Professional union organizers will recruit an in-plant committee of supporters to help them solicit employees to sign cards.  Tr. (Hiller) at p. 35, line 14 – p. 37, line 22.

11.      The NLRB's new Accelerated Election Rule became effective April 14, 2015.  It reduced the time for elections by 40%, from a prior average of 38 days. Tr. (Hiller) at p. 41, line 20 – p. 42, line 11; Pls.' Ex. 5.

---

[5] The Court finds that Mr. Meisburg is qualified as an expert witness pursuant to Federal Rule of Evidence 702 to testify regarding the practices and function of the NLRB, including union organizing campaigns, union elections, and employer and consultant practices during union elections.

12.    Unions have an unlimited amount of time to campaign and prepare for an election, usually in secret, before the campaign becomes known to the employer through the filing of a petition for election.  Tr. (Meisburg) at p. 202, lines 10-17.

13.    After receiving the signed cards, the union files a representation petition with the applicable NLRB regional office and submits the cards with the petition.  The cards are referred to as a "showing of interest" by the employees. Tr. (Hiller) at p. 36, line 19-24.

14.    If the "showing of interest" is sufficient, the NLRB regional office will send a Notice of Hearing, accompanied by a copy of the petition, to the targeted employer.  Tr. (Hiller) at p. 37, lines 1-7.

15.    Typically, the targeted employer's first knowledge of the organizing drive is the communication from the NLRB regional office.  Although a targeted employer might learn of the organizing drive before receiving the Notice of Hearing, it is much more typical that the targeted employer is caught unawares. Tr. (Hiller) at p. 37, lines 8-22; (Meisburg) at p. 202, line 8 – p. 203, line 11; (Graf) at p. 178, line 7-25.

16.    After they receive the Notice of Hearing from the NLRB regional office, a targeted employer will typically contact a management-side labor lawyer or a non-attorney labor relations consultant. Tr. (Hiller) at p. 37, line 23 – p. 38, line 2; (Meisburg) at p. 202, line 21 – p. 203, line 4; (Graf) at p. 179, lines 4-9.

17.    When labor lawyers meet with an employer who has just received a Notice of Hearing from the NLRB, the lawyers' advice is a combination of legal and tactical recommendations.   For example, the lawyers discuss the consequences of losing the election. The purpose of this discussion is to bring home to the employer the long-term consequences to the business of not winning the union election. Tr. (Hiller) at p. 38, line 3 – p. 40, line 3.

18.     If a labor lawyer is going to tell a targeted employer all he needs to know about what is coming at him, the lawyer cannot restrict their conversation to purely legal advice. The typical employer-client is not capable of promptly and properly educating his employees as to the consequences of unionizing. Tr. (Hiller) at p. 38, line 3 – p. 40, line 3.

19.     Labor attorneys generally do not deal directly with rank and file employees to explain the negative consequences of unionizing, so as not to trigger reporting as "persuaders" under the LMRDA. Tr. (Hiller) at p. 40, lines 4-24; (Graf) at p. 180, lines 3-16.

20.     Since 2001, the NLRB's published target had been to have elections conducted within a median of 42 days after petition filing. During the decade prior to April 14, 2015, elections actually occurred within a median of only 38 days post-petition. Tr. (Hiller) at p. 41, line 20 - p. 42, line 7.

21.     The NLRB's so-called "quickie" or "accelerated" election rule became effective April 14, 2015. *See* Pls.' Ex. 8. This NLRB rule reduced the time between petition filing and the election. It reduced the time for union elections by approximately 40%. Tr. (Hiller) at p. 41, lines 20-23; (Graf) at p. 178, lines 7-13.

22.     During an initial meeting with targeted employers, labor lawyers typically discuss the election timetable because it is not easy for employers to comply with the timetable, and the consequences of non-compliance are a rerun election. Tr. (Hiller) at p. 49, lines 6 – p. 50, line 2.

23.     A labor lawyer typically also discusses the requirement that the NLRB's Notice of Petition for Election be posted in conspicuous places and distributed electronically to employee-voters two days after the receipt of the Notice of Hearing. If an employer posts the notice in conspicuous places, but delays more than two days to distribute it electronically to employee-

voters, that would be grounds to set aside the results of the election. Tr. (Hiller) at p. 42, line 22 – p. 43, line 6 and Pls.' Ex. 7.

24.     Labor lawyers also typically discuss the requirement that by noon on the business day prior to hearing, which is normally the seventh business day after receipt of the Notice of Hearing, the employer must electronically file with the NLRB and serve on the union its Statement of Position. Tr. (Hiller) at p. 43, line 11-17 and Pls.' Ex. 7.

25.     The Statement of Position form asks whether the employer agrees that the NLRB has jurisdiction over the employer.  A typical employer cannot answer that question without a competent labor lawyer's help. Tr. (Hiller) at p. 43, line 11 – p. 46, line 6, and Pls.' Ex. 7, 9 and 10.

26.     The Statement of Position form also asks whether the employer agrees that the election unit proposed by the union is "appropriate."  Examples of "appropriate unit" issues include whether there might be a "fractured" unit and/or an "extent of organization" issue.  An example of a "fractured" unit is where some of the employees who were excluded from the election unit proposed by the union share more in common with some of the petitioned-for employees than the petitioned-for employees share in common with one another.  Regarding the potential "extent of organization" issue, Section 9(c)(5) of the NLRA prohibits the NLRB from giving controlling weight to the union's "extent of organization"; that is, the Board cannot draw the boundaries of the election unit to coincide with the union's success in getting cards signed. The average employer would not likely recognize the need to analyze such issues and, if appropriate, raise them in its Statement of Position without the assistance of an attorney. *Id.*

27.     The consequence of failing to raise such "unit" issues is waiver, or as the rule terms it, "preclusion." The employer will be precluded from raising or presenting any evidence on any issue that the employer failed to raise in a timely Statement of Position. *Id.*

28.     The Statement of Position form also requires the employer to file a list of the full names, work locations, shifts, and job classifications of all employees in the election unit proposed by the union, and if the employer contends that the unit proposed by the union is inappropriate, a separate list of the employees that the employer contends must be added to or excluded from the list of potential voters. *Id.*

29.     This requirement raises, among other issues, the question whether particular employees are "supervisors" for purposes of the NLRA. Section 2(11) of the NLRA defines who is a "supervisor." Supervisors are not eligible to vote in union elections. Tr. (Hiller) at p. 47, lines 12-25.

30.     It is not easy to determine which employees are, indeed, supervisors. Tr. (Hiller) at p. 48, lines 1-7.

31.     A typical employer would not be familiar with Section 2(11) of the NLRA and capable of determining who is and who is not a "supervisor." Tr. (Hiller) at p. 48, lines 8-15.

32.     In a typical union election, the NLRB regional office will hold a hearing to determine whether an election should be directed in the petitioned-for unit of employees. The hearing begins on the eighth day following the employer's receipt of the Notice of Hearing (excluding federal holidays), unless the eighth day falls on a weekend. That is, the hearing starts the day after the Statement of Position is due. Tr. (Hiller) at 48, line 20 – p. 49, line 5.

33.     Following the hearing, the NLRB regional director issues a Decision and Direction of Election which the employer is required to post and distribute electronically to the employee-voters. Tr. (Hiller) at p. 49, lines 6-10.

34.     The employer has two days after the direction of election to electronically provide both the NLRB and the union with what is called the "*Excelsior* list." The *Excelsior* list is a list of eligible voters and those employees who will vote under challenge which the employer must provide to the regional director and the union. The *Excelsior* list contains cell phone numbers and personal email addresses of employee-voters, if the employer has them. Tr. (Hiller) at p. 49, lines 11-19.

35.     The consequence of failing to timely file the Excelsior list is a rerun election. Due to the accelerated NLRB election rule, Mr. Hiller typically advices employers during his first meeting with them to start preparing the list immediately.    Tr. (Hiller) at p. 49, line 40 – p. 50, line 14.

36.     The election will not be scheduled for a date earlier than 10 days after service of the *Excelsior* list of voters is served.  However, the union can accelerate the election by waiving all or part of these 10 days. Tr. (Hiller) at p. 50, line 15 – p. 51, line 6.

37.     If the union does not opt to waive the 10 days, the election will typically occur twenty-one (21) days after the employer's receipt of the Notice of Hearing.  If the union opts to waive, that could be reduced to two weeks or less. *Id.*

38.     During an initial meeting with a targeted employer, a labor lawyer will typically provide non-legal advice including recommendations regarding courses of action, for example, that the employer should start to educate its employees on the consequences of unionizing such as the risks that employees take when they are called out on strike, and that the employer should

use small group meetings and get first-line supervisors heavily involved. Tr. (Hiller) at p. 51, line 7 – p. 52, line 16, and Pls.' Ex. 7.

39.     NLRB elections are now typically held 21 days after the NLRB serves a Notice of Hearing on the targeted employer, and the NLRB's Notice of Hearing is typically the targeted employer's first knowledge of the organizing effort. On the other hand, the employer's LM-20 report is not due to be filed until thirty (30) days after entering into a persuader arrangement with an attorney or labor relations consultant. Tr. (Hiller) at p. 55, line 2 – p. 56, line 1.

40.     In most cases the employee-voters will not have access to the employer's LM-20 report until after the NLRB has already held its election. Tr. (Hiller) at p. 55, lines 2-8.

## C.     The American Bar Association's opposition to DOL's New Rule as conflicting with attorneys' ethical duties

41.     In 2011, Mr. Robinson, in his capacity as ABA President, instructed the ABA's Governmental Affairs Office to evaluate the potential impact of the DOL's new Advice Exemption Interpretation on attorneys' ethical obligations. That office concluded that the DOL's New Rule would conflict with various ethical duties imposed by the ABA Model Rules of Professional Conduct and many state ethical rules based on them. Tr. (Robinson) at 157.

42.     Based on this conclusion, Mr. Robinson, on behalf of the ABA submitted a comment letter to the DOL dated September 21, 2011. The ABA expressed opposition to what is now DOL's new Advice Exemption Interpretation and urged the DOL not to adopt the proposed rule. The letter commented as follows:

> **On behalf of the American Bar Association ("ABA"), I write to express our serious concerns over the above-referenced proposed rule (the "Proposed Rule") that would substantially narrow the U.S. Department of Labor's ("Department") longstanding interpretation of what lawyer activities constitute "advice" to employer clients and hence are exempt from the extensive reporting requirements of Section 203 of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA" or "Act"), 29 U.S.C. § 433 (1982). By expressing concerns**

11

over the Proposed Rule and urging the Department to reconsider, the ABA is not taking sides on a union-versus-management dispute, but rather is defending the confidential client-lawyer relationship and urging the Department not to impose an unjustified and intrusive burden on lawyers and law firms and their clients.

. . .

**. . . In particular, we support the current interpretation of the advice exemption and oppose the Department's Proposed Rule to the extent it would apply to lawyers representing employer clients because:**

- The Department's longstanding interpretation of the "advice" exemption provides a useful, bright-line rule that is consistent with the actual wording of the statute and Congress' intent, while **the new proposed interpretation would essentially nullify the advice exemption contained in the statute and thwart the will of Congress;**

- **The Department's Proposed Rule is inconsistent with ABA Model Rule of Professional Conduct 1.6 dealing with "Confidentiality of Information" and with the many binding state rules of professional conduct that closely track the ABA Model Rule;**

- **The Proposed Rule could seriously undermine both the confidential client-lawyer relationship and the employers' fundamental right to counsel; and**

- **The scope of the information that the Department's Proposed Rule would require lawyers engaged in direct or indirect persuader activities to disclose encompasses a great deal of confidential financial information about clients that has no reasonable nexus to the "persuader activities" that the Act seeks to monitor.**

. . . Since at least 1989, however, the Department has broadly interpreted the "advice" exemption under Section 203(c) to generally exclude from the rule's disclosure requirements any advice or materials provided by the lawyer or other consultant to the employer for use in persuading employees, so long as the consultant has no direct contact with the employees. ⋯

. . .

12

. . . **In its Proposed Rule, the Department has proposed major changes to its longstanding interpretation and application of Section 203 that would require lawyers who both provide legal advice to employer clients and engage in any persuader activities to file periodic disclosure reports, even if the lawyer has no direct contact with the employees. These reports, in turn, would require lawyers (and their employer clients) to disclose a substantial amount of confidential client information, including the existence of the client-lawyer relationship and the identity of the client, the general nature of the legal representation, and a description of the legal tasks performed. The lawyers also would be required to report detailed information regarding the *legal fees paid by all of the lawyers' employer clients, and disbursements made by the lawyers, on account of "labor relations advice or services" provided to any employer client, not just those clients who were involved in persuader activities.***

. . .

**The Department's traditional broad interpretation of the "advice" exemption"—which exempts lawyers who provide legal advice or other legal services *to help their employer clients to persuade employees* but have *no direct contact with employees*—is entirely consistent with the plain wording of the statute and with Congress' intent as explained above.** When an employer retains a lawyer to advise and assist the employer in its disputes with its employees, including with regard to helping the employer to persuade employees as to organizational rights, the lawyer will ordinarily be asked to provide legal advice and other legal services to the employer that constitute the practice of law. So long as the lawyer limits his or her activities to providing advice and materials directly to the employer client and does not contact the employees directly, the Department should continue to deem these legal services to be exempt "advice" or "representation" under Section 203(c), and not reportable "persuader activity" under Section 203(b) of the statute.

. . .

**Conversely, if the Department's new proposed interpretation of the advice exemption were adopted** and a lawyer who only gives advice to an employer client in connection with the client's persuader activities, or who gives advice and provides other legal services in support of the client's persuader activities, were nonetheless subjected to the Act's disclosure requirements, **the advice exception in Section 203(c) would be effectively written out of the statute and the Department's persuader activities rule.** The ABA urges the Department to resist such an illogical interpretation that would nullify the advice exception and thereby clearly thwart the will of Congress.

13

. . .

> The ABA also is concerned that by requiring lawyers to disclose confidential client information to the government regarding the identity of the client, the nature of the representation, and details concerning legal fees, the Proposed Rule is inconsistent with ABA Model Rule of Professional Conduct 1.6 dealing with "Confidentiality of Information" and with the many binding state rules of professional conduct that closely track the ABA Model Rule. ABA Model Rule 1.6 states that "a lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent..." or unless one or more of the narrow exceptions listed in the Rule is present.

. . .

> By requiring lawyers to file detailed reports with the Department stating the identity of their employer clients, the nature of the representation and the types of legal tasks performed, and the receipt and disbursement of legal fees whenever the lawyers provide advice or other legal services relating to the clients' persuader activities, the Proposed Rule could chill and seriously undermine the confidential client-lawyer relationship. In addition, by imposing these unfair reporting burdens on both the lawyers and the employer clients they represent, the Proposed Rule could very well discourage many employers from seeking the expert legal representation that they need, thereby effectively denying them their fundamental right to counsel.

. . .

> In our view, these required disclosures proposed by the Department are unjustified and inconsistent with a lawyer's existing ethical duties under Model Rule 1.6 (and the related state rules) not to disclose confidential client information absent certain narrow circumstances not present here. Lawyers should not be required, under penalty of perjury, to publicly disclose confidential information regarding such clients who have not even engaged in or requested the persuader activities that the statute seeks to address. . . .

Tr. (Robinson) at p. 157, line 4 – p. 159, line 3; Pls.' Ex. 17 (Letter from Wm. T. (Bill) Robinson III, President of the American Bar Association, to the Office of Labor-Management Standards, U.S. Department of Labor (September 21, 2011) (emphasis added)).

43.     The ABA continues to oppose the DOL's New Rule on this basis.  On April 27, 2016, the ABA's current president, Paulette Brown, reiterated the ABA's position.  Tr. (Robinson) at p. 165, line 1 – p. 166, line 2; Pls.' Ex. 18.

44.     No bar association in the United States has endorsed the new DOL persuader Rule.  Tr. (Robinson) at 170.

45.     The concerns over ethics that Mr. Robison expressed were typical of those addressed by the other expert witnesses at the hearing.

**D.     The New Rule's threat to employers' access to legal and other advice**

46.     Don Graf is a partner of the law firm McCleskey, Harriger, Brazill & Graf, LLP located in Lubbock, Texas.  Mr. Graf was admitted to the Texas bar in 1962.  Tr. (Graf) at p. 175, line 18 – p. 176, line 5.[6]

47.     Mr. Graf's legal practice is based in Lubbock, Texas, and focuses on labor and employment law, including advising employers in responding to union election campaigns.  Tr. (Graf) at p. 175, line 25 – p. 176, line 19.

48.     Since 1962, Mr. Graf has participated in 15-20 union election campaigns advising employers.  Tr. (Graf) at p. 197, lines 4-9.  Mr. Graf is not aware of any other attorney in Lubbock, Texas, or in Northern Texas between El Paso and Dallas, who represents and advises employers in responding to union election campaigns.  Tr. (Graf) at p. 176, line 11-19.

49.     Most employee union units he has dealt with include groups of 50 employees or fewer.  Tr. (Graf) p. 177, line 10 – p. 178, line 3.

---

[6] The Court finds that Mr. Graf is qualified as an expert witness pursuant to Federal Rule of Evidence 702 to testify regarding the practice of labor law, particularly in the West Texas region, including employer and lawyer practices in responding to union organizing campaigns and the effect of DOL's new disclosure requirements on those practices.

50.    Mr. Graf is unwilling to provide seminars on union avoidance issues under the DOL's New Rule because it would require him to publicly report the identities of attendees. Moreover, employers would not want to attend such seminars if their identities were so reported. Tr. (Graf) at 188.

51.    Mr. Graf and his firm will cease representing employers in union organization matters if DOL's New Rule becomes effective and enforceable.  Tr. (Graf) at 190, line 24 – p. 191, line 10-191.

52.    Employers in Lubbock who seek representation regarding union organizing matters will be required to find attorneys elsewhere, such as Dallas, Houston, or El Paso at considerably higher expense. Tr. (Graf) at 190-191.

53.    Other law firms around the country have already started announcing their decisions to cease providing advice and representations that would trigger reporting under DOL's New Rule, including Morgan Lewis, which is one of the largest law firms in the U.S.  Tr. (Hiller) at 77-80; (Meisburg) at 200-201; Pls.' Ex. 15.

54.    Overall, DOL's New Rule will decrease employers' access to advice from an attorney of one's choice.  *Id.*

**E.    DOL's New Rule's negative impact on the Lubbock Chamber, TAB, and their member-employers**

55.    The Lubbock Chamber of Commerce (also referred to as "the Chamber") is the largest business organization on the Texas South Plains, representing over 2,000 businesses and over 79,000 employees. Its activities include business advocacy, business support, and community development efforts. It employs 15 people.  Tr. (Johnson) at p. 214, line 5-14.

56.    Its members join the Chamber for business networking and advocacy on public policy. Tr. (Johnson) at p. 214, lines 15-18.

57.     The Lubbock Chamber of Commerce is a member of the Texas Association of Business ("TAB").   TAB has over 4,000 members statewide.   Tr. (Johnson) at p. 214, line 19 – p. 215, line 2.

58.     The Chamber has almost 2,000 members.   95% of these member businesses have 50 employees or fewer, and 86% have 20 employees or fewer.   Tr. (Johnson) at p. 215, lines 5-9.

59.     Most of the Chamber's members do not have in-house legal counsel or labor relations experts to advise them on union organizing.   Tr. (Johnson) at p. 215, lines 10-12.

60.     The Chamber's members are located in Lubbock County, Texas, its adjacent counties, and some out of state.   Tr. (Johnson) at p. 215, lines 13-17.

61.     The Chamber also has 50 law firm members.   Tr. (Johnson) at p. 215, lines 18-20.

62.     The vast majority of the Chamber's members are not unionized and want to remain union-free.   Tr. (Johnson) at p. 215, line 21 – p. 216, line 1215.

63.     The Chamber has not engaged in "persuader" activity to trigger reporting under DOL's over-50-year-old bright-line test in effect before the New Rule.   Tr. (Johnson) at p. 216, lines 7-24.

64.     The Chamber frequently puts on seminars for its members and prospective members, where it generally relies on outside speakers.   The Chamber has put on several employment law seminars that include union topics.   Other specific union avoidance seminars have been held in Lubbock by groups such as the Society for Human Resource Management ("SHRM").   Tr. (Johnson) at p. 217, lines 25 – p. 218, line 2.

65.     The Court received into evidence copies of agendas for employment law seminars presented by TAB for 2012, 2013 and 2014, which included union and/or union avoidance topics.   Tr. (Johnson) at p. 219, line 5 – p. 220, line 24, and Pls.' Ex. 26.

17

66.     TAB has co-sponsored employment law seminars with the Chamber in Lubbock. Tr. (Johnson) at 219-220.

67.     The Defendants' new Persuader Rule will have a negative effect on the Chamber's ability to hold employment law and union avoidance seminars in several ways. The New Rule will likely affect the Chamber's ability to recruit speaker to present at seminars on union organizing matters. Tr. (Johnson) at p. 220, line 25 – p. 221, line 11.

68.     In addition, under the New Rule, the Chamber will need to inform potential attendees in promoting its seminars that if they do attend, their names will likely be disclosed to DOL and made publicly available. *Id.*

69.     Such disclosures will likely discourage members and other employers from attending the Chamber's seminars. Tr. (Johnson) at p. 220, line 25 – p. 221, line 18.

70.     Based on the above facts, the New Rule will make it less likely that Chamber members will attend educational seminars on union organizing issues, and it will cause such members to have less information on how to deal legally and effectively with unions. Seminar attendance will go down because of members' fear of publicity through public disclosures and of later targeting by unions for organizing drives. Tr. (Johnson) at p. 221, lines 12-18.

71.     The Chamber also receives calls from its members with questions about union organizing. The Chamber makes available to its members information from prior union avoidance seminars. Ms. Johnson has received at least two such calls herself while working for the Chamber. Tr. (Johnson) p. 221, line 24 – p. 222, line 14.

72.     In addition, the Chamber refers members to local law firms that could assist with union organizing matters. Tr. (Johnson) at p. 222, lines 8-14.

73.     The one law firm in Lubbock that has experience doing union avoidance work is McCleskey, Harriger, Brazill & Graf, LLP. Tr. (Johnson) at p. 222, lines 14-21.

74.     There would be harm to business owners in Lubbock if lawyers declined to represent employers in union organizing matters as a result of DOL's New Rule, because small business owners are not experts in labor law and do not have in-house legal counsel. They need competent legal advice to prevent non-compliance with federal labor laws related to union organizing. The New Rule will deprive small business owners of such competent representation, particularly in Lubbock and its surrounding counties because Mr. Don Graf, an attorney with the law firm of McCleskey, Harriger, Brazill & Graf, LLP testified that if the New Rule is enforced, then he and his law firm will no longer offer advice related to union organizing issues, depriving businesses in the Lubbock, Texas region of the only attorneys who are experienced in union avoidance legal work. Tr. (Johnson) at p. 222, line 8 p. 223, line 4.

75.     DOL's New Rule will have a detrimental effect on the Chamber, TAB, and their members because it will reduce employers' ability to access information, assistance, and advice relating to union organizing, which is expertise many employers do not have themselves. The New Rule will negatively impact the Chamber, TAB, and their members also because it will deter employers from seeking advice on non-persuader-related issues that might nevertheless be publicly reportable as "labor relations advice and service." Additionally, Chamber training offered to members would be curtailed, and attendance at such seminars will be negatively impacted, because its members will not want their attendance reported and made publicly available. Tr. (Johnson) at 227, line 2 – p. 228, line 4-28.

**F.     The New Rule's negative impact on NFIB and its member-employers**

76.     NFIB represents small business owners and independently operated businesses around the country, advocating for them at the state and national levels, and offering advice and

information through its Legal Center and Research Foundation, as well as helping encourage youth entrepreneurs through its Youth Entrepreneur Foundation. Tr. (Spilman) at p. 243, line 20 – p. 244, line 5.

77.     NFIB employs 800 persons nationwide, with five (5) in Texas. Tr. (Spilman) at p. 244, lines 6-10.

78.     NFIB's members join for its advocacy and resource information on public policy and best practices, mostly in labor and employment matters. Tr. (Spilman) at p. 244, lines 11-17.

79.     NFIB has 325,000 members, with about 22,000 in Texas, and over 1,000 in Lubbock. NFIB's members are located in all fifty states. TR. (Spilman) p. 245, line 7-9. In Texas, 96% of its members have 40 employees or fewer. Most of NFIB's members do not have in-house legal counsel or labor relations experts to advise them on union organizing. NFIB's members are located in every state. 877 of its members are law firms, 72 of which are from Texas. The vast majority of its members are not unionized. The NFIB ballots its members on certain issues, and a vast majority of its members want to remain union-free. Tr. (Spilman) at p. 244, line 18 – p. 245, line 21.

80.     NFIB has not engaged in "persuader" activity to trigger reporting under the DOL's over-50-year-old bright-line test in effect before the New Rule. Tr. (Spilman) at p. 245, lines 22 – p. 245, line 8.

81.     NFIB frequently puts on customized, and not "off the shelf," union awareness and union avoidance seminars for its members and prospective members, where it generally relies on outside speakers. It also occasionally relies on in-house speakers who are employees of NFIB. NFIB has produced several employment law seminars that include union topics. Tr. (Spilman) at

p. 246, line 9 – p. 247, line 2; p. 248, line 5 – p. 251, line 3; p. 265, line 5 – p. 266, line 1; *see also* Pls.' Ex. 33-35.

82.    DOL's New Rule will have a negative effect on NFIB seminars.   NFIB's members who attend union-avoidance seminars do not want their names publicly disclosed, in part, because they fear becoming targets of union campaigns.   Under DOL's New Rule, NFIB would be required to inform potential attendees that their attendance would be disclosed to DOL and the general public, which would discourage them from attending those seminars.   Tr. (Spilman) at p. 247, lines 3-17.

83.    The New Rule will make it less likely that NFIB members will attend these seminars, and NFIB members will therefore have less information on how to deal legally and effectively with unions.   Such attendance will go down because of members' fear of publicity due to required disclosures and fear of later targeting by unions for organizing drives.   Tr. (Spilman) at p. 247, line 1-17.

84.    Because the NFIB has strict internal rules to protect the confidentiality of its members, if DOL's New Rule goes into effect, NFIB will likely not offer seminars because doing so would require the disclosure of attendees.   Tr. (Spilman) at 247-48.

85.    NFIB also offers other services to its members who have questions regarding union organizing issues.   For example, NFIB's national call center fields calls from members on union organizing issues.   Tr. (Spilman) at p. 247, line 25 – p. 248, line 5.

86.    NFIB members call to receive advice regarding lawful responses to union organizing, and in 2015, NFIB answered 10 such calls at its Small Business Legal Center with questions on union organizing issues from small business owners.   Tr. (Spilman) at p. 248, line 6-14.

87.     NFIB also provides newsletter articles, webinars, employer handbooks, and referrals to outside consultants or lawyers regarding union avoidance matters.  For example, NFIB has offered to members the "NFIB Guide to Managing Unionization Efforts, Knowing Your Rights During a Union Organizing Campaign."  This guide provides employers practical advice on how to deal with union organizing drives and cautionary advice on what employers should not do to be compliant with the law.  NFIB has also presented webinars for its members such as "Maintaining Your Business, Big or Small, Union-Free, Know Your Rights."  NFIB has also made available web articles to its members, such as "What Can Your Business Lawfully Do to Avoid Unionization."  Tr. (Spilman) at 248-50; Pls.' Exs. 33, 34 & Tr. (Spilman) at p. 246, line 9 – p. 247, line 2; p. 248, line 5 – p. 251, line 3; p. 265, line 5 – p. 266, line 1; *see also* Pls.' Ex. 33-35.

88.     When NFIB's members need a labor lawyer to assist with a union organizing drive, NFIB refers them to outside counsel.  Tr. (Spilman) at 251.

89.     There would be harm to NFIB and its members if lawyers declined to represent employers in union organizing matters as a result of the New Rule, because small business owners are not experts in labor law and do not have in-house legal counsel.  They need competent legal advice to prevent non-compliance with federal labor laws related to union organizing.  If there were fewer options for obtaining such legal advice, it would be nearly impossible for small-business employers, which do not have in-house counsel or in-house human resources staff.  Tr. (Spilman) at p. 251, lines 4-16, p. 257.

### G.   The New Rule's negative impact on small employers

90.     Steven Massengale testified as a small business owner residing in Lubbock.  Tr. (Massengale) at p. 237 *et seq.*

91.     He owns two business, Advanced Graphix, a screen and promotional printing company, and The Matador, a retail clothing store with two locations. *Id.*, lines 21-23.

92.     His businesses employ between 35 to 50 full-time employees. *Id.*, lines 7-9.

93.     He has attended Lubbock Chamber of Commerce educational programs in the past dealing with regulatory matters. *Id.*, lines 21-23.

94.     Mr. Massengale was aware of Defendants' New Rule. His understanding of the Rule is that if his lawyer were to provide him any labor law advice that might persuade his employees not to join a union, or if he attended a trade group or Lubbock Chamber of Commerce seminar about that subject, his businesses would be reported to the United States Department of Labor as having received that advice. Additionally, his lawyer will have to report how much he was paid, and what advice was given regarding union avoidance matters. All of this information would be made available to the public by Defendants. Tr. (Massengale) at p. 239, lines 7-20.

95.     If the Lubbock Chamber of Commerce offered a program on union organizing, the fact that the speaker would report Mr. Massengale's attendance under DOL's New Rule would make it less likely for Mr. Massengale to want to attend such seminars, because of the negative publicity attendant to public disclosure surrounding the details of receiving such advice, and because of fear of being targeted by a union for organizing, once they have access to this information. Tr. (Massengale) at p. 239, lines 21 – p. 240, line 5.

96.     The fact that the DOL disclosure forms (LM 10 and LM 20) are publicly available makes Mr. Massengale disinclined to attend such seminars because of his desire not to divulge attorney-client privileged or confidential information, because of the negative publicity attendant

to such disclosure, and because of his fear of being targeted for union organizing. Tr. (Massengale) at p. 239, line 21 – p. 240. If Mr. Massengale were to ask the Lubbock Chamber of Commerce for literature on union organizing and they had to report having given it to Mr. Massengale, that fact would make Mr. Massengale less likely to ask for it due to the same fears. Tr. (Massengale) at p. 240, lines 6-10.

97.     If a union targeted employees at one of Mr. Massengale's companies, he would oppose unionization. Tr. (Massengale) at p. 240, lines 11-13.

98.     In such an event, he would want to hire a labor lawyer to represent his companies in his efforts to oppose unionization. Tr. (Massengale) at *Id.*, lines 14-16.

99.     Mr. Massengale would be less likely to hire a lawyer if he knew that his lawyer would have to report to the DOL, on publicly available forms, the retention agreement, and the fees paid, to give advice on opposing unionization.  This reluctance would be due to his desire not to divulge attorney-client privileged or confidential information, the negative publicity attendant to such disclosure, and for fear of being targeted for union organizing.   Tr. (Massengale) at p. 240, lines 17-23.

100.    Mr. Massengale consults with a local lawyer from time to time about employment matters not related to unions. Tr. (Massengale) at p. 240, lines 24 – p. 241, line 1.

101.    If his lawyer helped other employers oppose unionization and, as a result, had to report his agreement or arrangement with that other employer to the Department of Labor, along with the names of all employers (including Mr. Massengale's companies),  and the fees received from such other companies (including Mr. Massengale's), for "labor relations advice or services," even if not related to union organizing, with such information being made publicly available, then Mr. Massengale would be less likely to consult with his employment lawyer.

This reluctance stems from his desire not to divulge attorney-client privileged or confidential information, concern over the negative publicity attendant to such disclosure, and his fear of being targeted for union organizing. Tr. (Massengale) at p. 241, lines 2-11.

**H.    The costs of compliance with the New Rule**

102.    The costs associated with the New Rule are significant, including for small employers.

103.    For example, the law firm of Fisher Phillips employs about 335 lawyers, all of whom practice some facet of labor or employment law.  The Firm has over 7,000 clients.  The firm's lawyers enter their time for billing purposes on a daily basis.  On an annual basis, the firm's 335 lawyers log over 750,000 time entries.  Tr. (Hiller) at p. 73, lines 18 – p. 74, line 5.

104.    For Fisher Phillips to report accurately under DOL's New Rule, the firm would need to identify and segregate every increment of time billed to each of its clients for "labor relations advice or services," even if the firm was not doing any "persuader" consulting under the New Rule for that client currently.  This is because the Firm could not rule out the possibility that it will provide "persuader" advice and services under the New Rule and trigger reporting later in the year.  If, for example, the Firm did not begin to provide "persuader" advice and services under the New Rule for client X until September, the LM-21 report that the firm filed at the end of the year would cover receipts for the entire fiscal year, including the period prior to the Firm's performance of those "persuader" services in September.  Tr. (Hiller) at p. 74, line 6 – p. 76, line 21.

105.    Fisher Phillips has made an estimate of its initial cost of compliance with DOL's New Rule.  The firm believes that its costs of compliance with the New Rule will be $296,000. In addition, its annual recurring costs of compliance are estimated to be at least $56,000 annually.  Tr. (Hiller) at p. 88, lines 5, 8-16.

106.   The proposed rule could cost the U.S. economy between $7.5 billion and $10.6 billion during the first year of implementation, and between $4.3 billion and $6.5 billion per year thereafter; the total cost over a ten-year period could be approximately $60 billion – and this would not include the indirect economic effects of raising the cost of doing business in the United States.   Tr. (Hiller) at p. 81, line 17 – p. 82, line 12; Pls.' Ex. 5 at 1-2.

107.   According to Ms. Diana Furchtgott-Roth, former Chief Economist for DOL, despite "the increase in regulations from the NLRB, the Labor Department calculated that the entire burden of the rule would be $826,000 annually, based on the number of firms that would be expected to complete the form and the time that it would take these firms to complete it." Pls.' Ex. 5 at 5 n.10.

108.   "To arrive at this cost, the department assumed that it would receive forms from only 3,414 employer firms (Form 10) and 2,601 advising firms (Form 20).   Employers would spend two hours per year completing Form 10, and advisers would spend one hour completing Form 20.   The department does not provide a cost estimate for firms completing the required Form 21, although instructions for the form estimate the reporting burden to be 35 minutes per response." *Id.* at 5.

109.   "The department's cost estimate is too low.   The department has underestimated the number of entities that will file the forms as well as the time that it will take firms to comply with the regulations . . . .   The department should have examined what the cost would be if all potentially affected employers and advisers were to file.   This would have provided an honest assessment of the potential effect of the proposed rule." *Id.*

110.   "This brings the cost of the proposed rule well over the $100 million level that requires the agency to perform a cost-benefit analysis.  The department calculated no benefits from the proposed rule."  *Id.* at 5-6.

111.   To the extent any of the foregoing Findings of Fact should more properly be denominated as Conclusions of Law, they are hereby deemed to be such.


## II.  CONCLUSIONS OF LAW

Based upon the above findings, the Court makes the following conclusions of law:

### A.   Legal Background

#### 1.   The LMRDA's disclosure requirements and the Advice Exemption

1.   Section 203(a) of the LMRDA is titled "Filing and contents of report of payments, loans, promises, agreements, or arrangements."  It provides in relevant part as follows:

> Every employer who in any fiscal year made-
>
> [...]
>
> (4)   any agreement or arrangement with a labor relations consultant or other independent contractor or organization pursuant to which such person undertakes activities where an object thereof, directly or indirectly, is to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing, or undertakes to supply such employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding; or
>
> (5)   any payment (including reimbursed expenses) pursuant to an agreement or arrangement described in subdivision (4);
>
> shall file with the Secretary a report, in a form prescribed by him, signed by its president and treasurer or corresponding principal officers showing in detail the date and amount of each such payment, loan, promise,

agreement, or arrangement and the name, address and position, if any, in any firm or labor organization of the person to whom it was made and a full explanation of the circumstances of all such payments, including the terms of any agreement or understanding pursuant to which they were made.

29 U.S.C. § 433(a). Simply stated, Section 203(a) requires the filing of reports by employers who hire consultants, including attorneys, to engage in what are commonly referred to as "Persuader Activities."

    2.    Section 203(b) of the LMRDA states:

Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly –

    (1) to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing; or

    (2) to supply an employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding;

shall file within thirty days after entering into such agreement or arrangement a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing the name under which such person is engaged in doing business and the address of its principal office, and a detailed statement of the terms and conditions of such agreement or arrangement. Every such person shall file annually, with respect to each fiscal year during which payments were made as a result of such an agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof, and (B) of its disbursements of any kind, in connection with such services and the purposes thereof. In each such case such information shall be set forth in such categories as the Secretary may prescribe.

29 U.S.C. § 433(b). Simply stated, Section 203(b) of the LMRDA requires consultants, including attorneys, who are hired by employers to perform Persuader Activities to file certain public reports.

3.     The LMRDA also expressly limits the scope of the reporting and disclosure requirements established by the statute.

4.     Section 203(c) established what has become known as the "Advice Exemption" from the LMRDA's reporting requirements.  Section 203(c) provides:

> **(c) Advisory or representative services exempt from filing requirements**
>
> Nothing in this section shall be construed to require any employer or other person to file a report covering the services of such person by reason of his giving or agreeing to give advice to such employer or representing or agreeing to represent such employer before any court, administrative agency, or tribunal of arbitration or engaging or agreeing to engage in collective bargaining on behalf of such employer with respect to wages, hours, or other terms or conditions of employment or the negotiation of an agreement or any question arising thereunder.

29 U.S.C. § 433(c) (emphasis added).  Thus, where a consultant, including attorneys, provides only advice to the employer, no reporting is triggered and nothing must be filed with, or submitted to, DOL.

5.     Section 204 of the LMRDA is titled "Exemption of Attorney-Client Communications."  Section 204 provides:

> Nothing contained in [the LMRDA] shall be construed to require an attorney who is a member in good standing of the bar of any State, to include in any report required to be filed pursuant to the provisions of this Act any information which was lawfully communicated to such attorney by any of his clients in the course of a legitimate attorney-client relationship.

29 U.S.C. § 434 (emphasis added).

6.      Section 205 of the LMRDA is titled "Reports and documents as public information." Section 205 provides that reports and disclosures required under Sections 203(a) and (b) are public information that DOL may publish, that DOL must make that information available to any person for inspection and examination, and that DOL must provide copies of such reports and documents upon request. 29 U.S.C. § 435.

7.      Section 208 of the LMRDA authorizes the Secretary to "issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under this subchapter and such other reasonable rules and regulations . . . as he may find necessary to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438.

8.      Pursuant to Section 203(a), DOL requires that employers complete and file a Form LM-10 (Employer Report) disclosing all payments made to unions and union officials, persuader payments made to employees and employee committees, and persuader agreements/arrangements made with labor relations consultants (including attorneys) along with the amount and dates of payments made and expenditures made to interfere with, restrain or coerce employees, or otherwise to obtain information concerning employees or a labor organization. Employers required to file Form LM-10 must do so within ninety days of the completion of the employer's fiscal year.

9.      Pursuant to Section 203(b), DOL requires that labor relations consultants (including attorneys) complete and file a Form LM-20 (Agreement & Activities Report) specifying, among other things, information relating to all persuader agreements and the nature of persuader activities undertaken by the consultant. Form LM-20 must be completed and filed by the consultant within thirty days of the consultant agreeing to engage in reportable activity.

10. Also pursuant to Section 203(b), DOL further requires the completion and filing of Form LM-21 (Receipts and Disbursements Report) by consultants (including attorneys) who engage in Persuader Activities. Form LM-21 must be filed within ninety days after the completion of the consultant's fiscal year. Using Form LM-21, consultants must report "receipts from employers in connection with labor relations advice or services regardless of the purposes of the advice or services." They must also report "all disbursements [to their officers and employees] . . . in connection with labor relations advice or services rendered to employers."

11. The LMRDA does not define the phrase "labor relations advice or services" utilized in Form LM-21.

12. Section 209 of the LMDRA provides criminal penalties for willful violations, knowingly false reports, and knowing omissions with respect to the statute's reporting and disclosure requirements, which are punishable with fines up to $10,000.00 and/or imprisonment up to one year. 29 U.S.C. § 439(b) and (c). Section 209 further provides that individuals required to sign reports under Section 203 are deemed personally responsible for them. 29 U.S.C. § 439(d).

13. For over five decades, from 1962 through 2016, DOL interpreted the Advice Exemption in Section 203(c) to exclude from the LMRDA's reporting requirements an employer's engagement of a consultant (including an attorney) to assist the employer in responding to a union organizing campaign so long as the consultant (including an attorney) had no direct contact with employees and the employer was free to accept or reject the consultant's (including an attorney's) recommendations.

14. Among the many activities considered to fall within the Advice Exemption was a lawyer's preparation of documents and speeches for an employer's use during union organizing,

the training of managers and supervisors through seminars and otherwise, and the development of personnel policies and practices, all of which the employer is always free to accept or reject, or to revise as they see fit.

15.     DOL's longstanding interpretation of the Advice Exemption was derived from a 1962 memorandum by President John F. Kennedy's Solicitor of Labor, Charles Donahue ("the Donahue Memo"), which declared consultant, including attorney, communications to be advice within the meaning of the Advice Exemption if:

> (1)     the consultant did not communicate directly with non-management/supervisory employees; and
>
> (2)     the employer was free to accept or reject the consultant's advice.

*See* LMRDA Interpretative Manual Entry § 265.005; *see also* 76 Fed. Reg. 36,178, 36,180 (June 21, 2016); 81 Fed. Reg. 15,931; *International Union, United Auto., etc. ("UAW") v. Dole*, 869 F.2d 616, 618 (D.C. Cir. 1989) (Ginsburg, J.); *Wirtz v. Fowler*, 372 F.2d 315, 330 & n.32 (5th Cir. 1966) (noting authorities reasoning that the Advice Exemption should be applicable to "all activities of the lawyer in which it is contemplated that the client will be the ultimate implementing actor and in which the client retains the power to accept or reject the activities of the lawyer" and "not include activities in which the lawyer or his agent implement the activity by interposition between the client and his employees").[7]

16.     Section 265.005 of DOL's LMRDA Interpretative Manual, incorporating the Donahue Memo, states:

> We have concluded that such an activity can reasonably be regarded as a form of written advice where it is carried out as part of a bona fide

---

[7] *Price v. Wirtz*, 412 F.2d 647, 648 & n. 3 (5th Cir. 1969) (en banc) overruled only Part VII of *Fowler*, which otherwise remains binding precedent.

undertaking which contemplates the furnishing of advice to an employer. Consequently, such activity in itself will not ordinarily require reporting unless there is some indication that the underlying motive is not to advise the employer. **In a situation where the employer is free to accept or reject the written material prepared for him and there is no indication that the middleman is operating under a deceptive arrangement with the employer, the fact that the middleman drafts the material in its entirety will not in itself generally be sufficient to require a report.**

LMRDA Interpretative Manual Entry § 265.005 (Jan. 19, 1962) (emphasis added).

Pls.' Ex. 22.

17.     Under DOL's prior, longstanding interpretation of the LMRDA, an attorney or consultant hired by an employer to provide advice with respect to union organizing and/or collective bargaining would be exempt from the LMRDA reporting requirements pursuant to the Advice Exemption so long as the consultant did not engage directly with employees with respect to an employer's persuader activities.  Assistant Secretary for Labor-Management Standards Mario A. Lauro, Jr., described DOL's interpretation of the Advice Exemption as follows:

> **[The] usual indication that an employer-consultant agreement is exempt [from reporting] is the fact that the consultant has no direct contact with employees and limits his activity to providing to the employer or his supervisors advice or materials for use in persuading employees which the employer has the right to accept or reject.**

Memorandum of Acting Deputy Assistant Secretary for Labor-Management Standards Mario A. Lauro, Jr. (Mar. 24, 1989) (emphasis added). Pls.' Ex. 24.

18.     In short, DOL and the courts have long interpreted the LMRDA's Advice Exemption as exempting from reporting all advice, including advice that had an object to persuade and would, absent the exemption, otherwise trigger reporting.

### 2.     DOL's New Rule interpreting the Advice Exemption

19.     On June 21, 2011, DOL published a Notice of Proposed Rulemaking in the Federal Register regarding the LMRDA's Advice Exemption.  76 Fed. Reg. 36,178 (June 21,

2011).  DOL proposed a new interpretation of the Advice Exemption Rule.  This New Rule substantially revised DOL's prior longstanding interpretation of the Advice Exemption contained in LMRDA, 29 U.S.C. § 433(c).  In pertinent part, the New Rule no longer protects closed-door, confidential communications between attorney and client. To the contrary, under the New Rule, an attorney that communicates confidentially with only his or her employer-client, advising the client about a unionization matter, is now required to disclose to DOL, and thus the world, confidential information.

20.     DOL published its new Advice Exemption Interpretation as a final rule on March 24, 2016. It became effective on April 25, 2016.  81 Fed. Reg. 15,924.  DOL'S New Rule will be applicable to arrangements and agreements as well as payments (including reimbursed expenses) made on or after July 1, 2016.  81 Fed. Reg. 15,924.

21.     DOL's new Advice Exemption Interpretation constitutes final agency action.

22.     DOL's new Advice Exemption Interpretation (A) changes the instructions and contents of Forms LM-10 and LM-20 to accord with DOL's new interpretation of the Advice Exemption and (B) expands the reporting detail required by Forms LM-10 and LM-20 with respect to reportable agreements and arrangements.  The revised instructions accompanying DOL's revised Forms LM-10 and LM-20 define advice that is exempted under the new rule from DOL's reporting requirements as follows:

> No report is required covering the services of a labor relations consultant by reason of the consultant's giving or agreeing to give advice to an employee.  **"Advice" means an oral or written recommendation regarding a decision or a course of conduct . . . .**

81 Fed. Reg. 16,028 (emphasis added).

23.     DOL's New Rule purports to make "advice" and activities with an object to persuade mutually exclusive concepts.  For example, the Final Rule provides:

"Advice" does not include persuader activities, *i.e.*, actions, conduct, or communications by a consultant on behalf of an employer that are undertaken with an object, directly or indirectly, to persuade employees concerning their rights to organize or bargain collectively.

81 Fed. Reg. 15,937.

24.    DOL's New Rule further provides:

If the consultant engages in both advice and persuader activities, however, the entire agreement or arrangement must be reported.

81 Fed. Reg. 15,937.

25.    DOL's new Advice Exemption Interpretation also provides:

DOL reiterates the rule in effect for 50 years requiring direct contact with an employee to establish an engagement in Persuader Activity **and four new instances which DOL asserts establish participation by a consultant in Persuader Activity without direct employee contact under the new rule.** There are five general scenarios in which the underlying test for persuasion is to be applied, one in which the consultant engages in direct contact with employees and four in which the consultant does not engage in direct contact:

**Reporting of an agreement or arrangement is triggered when:**

**(1)**    A consultant engages in *direct* contact or communication with any employee with an object to persuade such employee; or

**(2)**    **A consultant who has no direct contact with employees undertakes the following activities with an object to persuade employee;**

**(a)**    **Plans, directs, or coordinates activities undertaken by supervisors or other employer representatives, including meetings and interactions with employees;**

**(b)**    **Provides material or communications to the employer, in oral, written, or electronic form, for dissemination or distribution to employees;**

> **(c)     Conducts a seminar for supervisors or other employer representatives; or**
>
> **(d)     Develops or implements personnel policies, practices, or actions for the employer;**
>
> The activity that triggers the consultant's requirement to file the Form LM-20 also triggers the employer's obligation to report the agreement on the Form LM-10 . . . .

81 Fed. Reg. 15,938 (emphasis added).

26.     Revised Forms LM-10 and LM-20 are attached to DOL's new Advice Exemption Interpretation.  Among the new "Persuader Activities" specifically described in DOL's revised Forms LM-10 and LM-20 which trigger reporting obligations are the following:

> A.     Drafting, revising, or providing written materials for presentation, dissemination, or distribution to employees;
>
> B.     Drafting, revising, or providing a speech for presentation to employees;
>
> C.     Drafting, revising, or providing audiovisual or multi-media presentations for presentation, dissemination, or distribution to employees;
>
> D.     Drafting, revising, or providing website content for employees;
>
> E.     Planning or conducting individual or group employee meetings;
>
> F.     Planning or conducting group employee meetings;
>
> G.     Training supervisors or employer representatives to conduct individual or group employee meetings;
>
> H.     Coordinating or directing the activities of supervisors or employer representatives;
>
> I.     Establishing or facilitating employee committees;
>
> J.     Developing personnel policies or practices;

K.    Identifying employees for disciplinary action, reward, or other targeting action;

L.    Speaking with or otherwise communicating directly with employees;

M.    Other.

81 Fed. Reg. 16,038. The LM-20 Form adds an additional category of conducting seminars. 81 Fed. Reg. 16,051.

27.    DOL's new Advice Exemption Interpretation requires all consultants (including attorneys, law firms, and associations) who engage in these newly defined persuader activities to complete and file the revised Form LM-20 (Agreement & Activities Report) containing the information described above.

28.    Pursuant to Section 203(b) of the LMRDA, such consultants must also compete and file the annual Form LM-21 (Receipts and Disbursements Report). Form LM-21 requires all consultants (including attorneys, law firms, and associations) engaged in Persuader Activity to "**[r]eport all receipts from employers in connection with labor relations advice or services regardless of the purposes of the advice or services**" and to "[r]eport all disbursements [to officers and employees of the consultant] made . . . in connection with labor relations advice or services rendered to the employers listed [as receiving receipts]." (Emphasis added).

29.    Neither DOL's new Advice Exemption Interpretation nor Form LM-21 define or restrict what constitutes "labor relations advice or services." However, DOL's interpretation does not limit that phrase only to an attorney's or consultant's "persuader" clients. *See Price v. Wirtz*, 412 F.2d 647, 649 (5th Cir. 1969) (noting DOL's position that "the annual report [under Section 203(b)] of one purposefully engaging in a single persuader activity must then report for

**all labor clients** – persuader or non-persuader – all receipts received from each of them on account of labor relation advice or services and disbursements of any kind – persuader or non-persuader – in connection with such services." (emphasis added)).

30.      Plaintiffs and similar associations will, under DOL's New Rule, be required to file Forms LM-20 and LM-21 if they provide any advice or suggestions to employer-members with respect to any of the so-called Persuader and Information Supplying Activities described on DOL's revised Form LM-20. Under DOL's new Advice Exemption Interpretation, Plaintiffs and similar associations will also be required to complete and file Forms LM-20 and LM-21 if they provide an employer, including members, with any union avoidance materials other than what DOL describes as "'off-the-shelf' persuader materials . . . without any input by the [association] concerning the selection or dissemination of the materials." 81 Fed. Reg. 15,940. Under DOL's new Advice Exemption Interpretation, Plaintiffs and other associations will be required to complete and file Form LM-20 disclosing any arrangements and agreements relating to their sponsorship of union avoidance seminars and Form LM-21 listing the employers attending any such seminar in instances where an employee of the association serves as a presenter at the seminar. 81 Fed. Reg. 15,940. Even if no employee of an association makes a presentation at a union avoidance seminar sponsored by the association, all consultants making a presentation at such a seminar are required under the DOL's New Rule to complete and file Form LM-20 listing all employers who attend the seminar, including members of the association. 81 Fed. Reg. 16,028.

31.      DOL has indicated that it intends to update Form LM-21 and "currently estimates that a **proposed** rule on the Form LM–21 will be published in September 2016." 81 Fed. Reg.

15,992 n.88 (emphasis added).   At this time, no such revised Form LM-21 form has been proposed or adopted.

32.   The time between DOL's proposed rule concerning its revisions of LM-10 and LM-20 was nearly five years. *Compare* 76 Fed. Reg. 36,178 (June 21, 2011) *with* 81 Fed. Reg. 15,924 (Mar. 24, 2016).

33.   The Court finds that an uncertain and perhaps significant period of time may pass until any revised version of LM-21 is proposed, finalized, and becomes effective.

### 3.   DOL's Special Enforcement Policy

34.   After this litigation was filed, DOL announced a "Special Enforcement Policy" on April 13, 2016.  In pertinent part, DOL's Special Enforcement Policy states:

> In light of changes to the LM-20 and potential changes in Form LM-21 reporting obligations that may be proposed in the upcoming rulemaking, OLMS has determined that a special enforcement policy should apply.  Those filers of Form LM-20 who must also file a Form LM-21 will not be required to complete two parts of the LM-21. Specifically, OLMS will not take enforcement action based upon a failure to complete the following Parts of Form LM-21.
>
> •   Part B (Statement of Receipts), which ordinarily requires the filer to report all receipts from employers in connection with labor relations advice or services regardless of the purposes of the advice or services, and/or
>
> •   Part C (Statement of Disbursements), which ordinarily requires the filer to report all disbursements made by the reporting organization in connection with labor relations advice or services rendered to the employers listed in Part B.
>
> • • •
>
> This special enforcement policy is effective immediately.   It will remain in effect until further notice, which will be provided no less than 90 days prior to any change.

http://www.dol.gov/olms/regs/compliance/ecr/lm21_specialenforce.htm.  *See also* Pls.' Ex. 14.

35.     DOL may reverse the Special Enforcement Policy at any time at its own discretion with 90 days' notice and has not indicated that the Special Enforcement Policy will remain in effect until any revised LM-21 Form is proposed and finalized.

36.     Also, irrespective of DOL's Special Enforcement Policy, the plain text of Section 203(b) of the LMRDA requires those who file an LM-20 Form also to "file annually, with respect to each fiscal year during which payments were made as a result of [a persuader] agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof, and (B) of its disbursements of any kind, in connection with such services and the purposes thereof." 29 U.S.C. § 433(b).

37.     Regardless of the DOL's temporary and uncertain Special Enforcement Policy, many, if not most, attorneys and other consultants who would be required to file LM-20 reports under DOL's New Rule will need to arrange their affairs as if the annual reporting requirement of Section 203(b) also applied and might, at any time, again be enforced.  Many attorneys and other consultants will be required to decide now whether they will continue to provide services to any clients that would trigger such disclosures and, if so, to inform all of their clients for "labor relations advice or services" of the potential for disclosures.  Moreover, associations and others who provide seminars, select written materials, and provide other advice to employers that could trigger reporting will similarly need to plan for potential disclosures, which may include ceasing to engage in such potentially triggering activities.

### 4.     The Association-Plaintiffs' standing

38.     Plaintiffs NFIB, TAB, Lubbock Chamber, NAHB, and Texas Builders have standing to bring this litigation on behalf of themselves and their members.

39.     Plaintiffs' members would otherwise have standing to sue in their own right, the interests at stake in this case are germane to Plaintiffs' organizational purposes, and neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members. *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

### 5.    Evidence outside the administrative record

40.     This Court may receive and consider evidence outside of the administrative record relating to Plaintiffs' and Intervenor-Plaintiffs' applications for a preliminary injunction.[8] This Court has explained:

> A court may . . . elect to allow extra-record evidence to determine whether an agency's final action meets the test of rationality under the following circumstances:
>
> 1. when agency action is not adequately explained in the record before the court;
>
> **2. when the agency failed to consider factors which are relevant to its final decision;**
>
> 3. when an agency considered evidence which it failed to include in the record;
>
> **4. when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;**
>
> **5. in cases where evidence arising after the agency action shows whether the decision was correct or not;**
>
> 6. in cases where agencies are sued for a failure to take action;
>
> 7. in cases arising under NEPA; and
>
> **8. in cases where relief is at issue, especially at the preliminary injunction stage.**

---

[8] The Court notes that DOL has not filed the administrative record to date.

*Davis Mts. Trans-Pecos Heritage Ass'n v. United States Air Force*, 249 F. Supp. 2d 763, 776 (N.D. Tex. 2003) (citation omitted; emphasis added), *vacated sub nom. on other grounds*, *Davis Mountains Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*, 116 F. App'x 3 (5th Cir. 2004). Numerous of these factors apply in this case.[9]

41.     As explained below, to obtain a preliminary injunction, Plaintiffs and Intervenor-Plaintiffs must establish "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the balance of hardships weighs in [Plaintiffs' and Intervenor-Plaintiffs'] favor; and (4) the issuance of the preliminary injunction will not disserve the public interest." *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015) (granting preliminary injunction and ordering DOL to stay application of a final rule pending a decision on the merits). "The four prerequisites for preliminary injunctive relief are mixed questions of fact and law." *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

42.     As noted in *Davis Mountains*, the consideration of evidence outside of the administrative record is appropriate "in cases where relief is at issue, especially at the preliminary injunction stage." 249 F. Supp. 2d at 776.   Indeed, at the preliminary injunction

---

[9] The Fifth Circuit has more recently referred to a three-factor test for considering materials outside of the administrative record. In *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010), the Court explained supplementation of the administrative record is appropriate where "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . . (2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." Courts within the Fifth Circuit have concluded that "[m]ost, and perhaps all, of the eight *Davis Mountains* exceptions fit within the three broader categories in *Medina*." and "it does not seem that there will often be a significant practical distinction between the eight exceptions listed in *Davis Mountains* and the three listed in *Medina*." *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Engineers*, No. 3:13-CV-126, 2015 WL 1883522, at *3 (S.D. Tex. Apr. 20, 2015). *See also La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 2011 U.S. Dist. LEXIS 33615, 2011 WL 1230099, at *9 (S.D. Tex. Mar. 30, 2011) (same).

stage, it is necessary to consider evidence concerning, for example, the substantial threat of irreparable harm, the balance of hardships, and the impact on the public interest at stake. DOL has not shown that its administrative record could possibly contain evidence on these issues, which the Court must consider in determining whether to grant preliminary injunctive relief.

43.     Moreover, Plaintiffs and Intervenor-Plaintiffs allege a number of claims outside of the APA. Specifically, in their Complaint, Plaintiffs challenge DOL's new Advice Exemption Interpretation based on the First Amendment to the U.S. Constitution because the New Rule violates Plaintiffs' and their members' free speech rights (Second Cause of Action)[10]; based on the Fifth Amendment to the U.S. Constitution because the New Rule imposes criminal sanctions but fails to define with necessary clarity what conduct is outlawed (Third Cause of Action); and based on the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601, because DOL failed to properly account for the costs of the New Rule (Fourth Cause of Action).

44.     DOL has not shown that all of the evidence relevant to Plaintiffs' non-APA claims is included within the administrative record.

45.     Moreover, extra-record evidence may be admitted "to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors." *Medina Cty.*, 602 F.3d at 706; *see also Davis Mts.*, 249 F. Supp. 2d at 776 (exceptions to "record rule" appropriate "when the agency failed to consider factors which are relevant to its final decision," "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly," "in cases where evidence arising after the agency action shows

---

[10] Plaintiffs also claim that DOL's New Rule is preempted by Section 8(c) of the NLRA, 29 U.S.C. § 158(c).

whether the decision was correct or not," and "in cases where relief is at issue, especially at the preliminary injunction stage.").

46.     Finally, Plaintiffs allege that DOL's New Rule also violates the APA because it is arbitrary, capricious, and an abuse of discretion pursuant to 5 U.S.C. § 706. Plaintiffs have presented evidence showing, among other facts, that:

- DOL New Rule will, as a practical matter, impose conflicting requirements on attorneys by requiring that they violate their ethical duty of confidentiality and the attorney-client privilege under state law; and

- Law firms already are announcing that they will refuse to provide advice that would require reporting under DOL's New Rule.

47.     Again, this type of evidence is properly considered by the Court "to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors." *Medina Cty.*, 602 F.3d at 706; *see also Davis Mts.*, 249 F. Supp. 2d at 776.

48.     Finally, the Court notes that it would conclude that a preliminary injunction is appropriate even without considering any of the evidence submitted at the evidentiary hearing.

**B.     Plaintiffs and Intervenor-Plaintiffs are entitled to a preliminary injunction.**

49.     Plaintiffs and Intervenor-Plaintiffs are entitled to injunctive relief.

50.     To secure a preliminary injunction, Plaintiffs and Intervenor-Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits of their case; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any damage that the injunctive order might cause the Defendants; and (4) that the order will not be adverse to the public interest. *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 418–20, n.15 (5th Cir. 2001); *Dallas*

*Cowboys Cheerleaders v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979); *Barton v. Huerta*, 2014 WL 4088582, at *1 (N.D. Tex. 2014), *aff'd*, 613 F.App'x 426 (5th Cir. 2015).

51.     To preserve the status quo, federal courts may enjoin federal agencies, including DOL, from implementing and enforcing new regulations pending litigation challenging them. *See, e.g., Texas v. United States,* 809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015), *aff'd by an equally divided court,* --- S.Ct. ---- 2016 WL 3434401 (June 23, 2016); *Texas v. United States*, 95 F. Supp. 3d 965, 983 (N.D. Tex. 2015) (granting plaintiffs' application for preliminary injunction and enjoining DOL from applying a New Rule "pending a full determination of this matter on the merits"); *Bayou Lawn & Landscape Servs. v. Oates*, 713 F.3d 1080, 1083 (11th Cir. 2013) (affirming district court order granting a preliminary injunction prohibiting DOL's enforcement of certain rules during the pendency of action).

**1.     Plaintiffs and Intervenor-Plaintiffs have shown a substantial likelihood of success on the merits.**

52.     Plaintiffs and Intervenor-Plaintiffs are substantially likely to succeed on their claims.

**a.     Plaintiffs and Intervenor-Plaintiffs will likely succeed on their claim that DOL lacks statutory authority to promulgate and enforce its new Advice Exemption Interpretation.**

53.     The Court finds that Plaintiffs and Intervenor-Plaintiffs are likely to succeed on their claim that DOL's New Rule exceeds DOL's authority under the LMRDA by effectively eliminating the statute's Advice Exemption contrary to the plain text of Section 203(c).

54.     The Court notes that on June 22, 2016, the District of Minnesota came to the same conclusion. *See Labnet Inc. v. United States Dep't of Labor*, 2016 U.S. Dist. LEXIS 81884, at *20-*21, Case No. 16-CV-0844, ECF No. 61 (D. Minn. June 22, 2016). The Minnesota court

found that "[a]t the root of DOL's problem is its insistence that persuader activity and advice are mutually exclusive categories." *Id.* at *15. The court explained:

> By starting with the premise that, if something is persuader activity, it cannot possibly be advice, DOL ends up struggling mightily to define as non-advice activity that any reasonable person would define as advice. And in the course of that struggle, DOL ends up drawing lines that are simply incoherent.

*Id.* at *15-*16. The court further reasoned that "[p]roceeding from that flawed premise, DOL categorizes conduct that clearly constitutes advice as reportable persuader activity." *Id.* at *20. Therefore, the court found "that plaintiffs have a strong likelihood of success on their claims that [DOL's] new rule conflicts with the plain language of the [LMRDA]." *Id.* at *20-*21. This Court agrees with that conclusion.

55.     "An agency must interpret its implementing legislation in a reasonable manner and may not make findings or promulgate regulations in a manner that is arbitrary or capricious in substance, or manifestly contrary to the statute." *Highland Med. Ctr. v. Leavitt*, No. 5:06-cv-082-C, 2007 WL 5434880, at *3 (N.D. Tex. 2007) (quoting *Clark Reg'l Med. Ctr. v. United States HHS*, 314 F.3d 241, 244 (6th Cir. 2002)).

56.     When reviewing an agency's construction of a statute under the Administrative Procedures Act, courts apply the two-step analysis established by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Under step one, where "Congress has directly spoken to the precise question at issue," courts must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Courts "must reject administrative constructions which are contrary to clear congressional intent." *Highland Med. Ctr.*, 2007 WL 5434880, at *3. On the other hand, "if Congress' intent is unclear, the court must determine whether the agency's construction is based upon a permissible construction of the statute." *Id.* (internal quotation marks omitted). Pursuant to the APA, courts must "hold unlawful and set aside an action by an

agency that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Odessa Reg'l Hosp. v. Leavitt*, 386 F.Supp.2d 885, 890 (W.D.Tex. 2005) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)); 5 U.S.C. § 701 *et seq.* (2012). DOL'S New Rule should be set aside because DOL "exercise[d] its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Raggsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002).

57.     DOL's new Advice Exemption Interpretation and its revision of reporting requirements under Forms LM-10 and LM-20 effectively eliminate the LMRDA's Advice Exemption from the LMRDA. DOL's new Advice Exemption Interpretation is therefore contrary to the express language of the LMRDA's Advice Exemption, which provides an exemption for advice. *See* 29 U.S.C. § 203(c).

58.     Under *Chevron* Step 1, where statutory language has a "plain and unambiguous" meaning, the court need look no further. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "If the intent of Congress is clear, - that is, the statute is unambiguous with respect to the question presented – the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Khalid v. Holder*, 655 F.3d 363, 366 (5th Cir. 2011) (quoting *Chevron*, 467 U.S. at 842–43), *abrogated on other grounds by Scialabba v. Cuellar de Osorio*, 134 S.Ct. 2191 (2014). Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose. *Thompson v. Goetzmann*, 337 F.3d 489, 498 n.19 (5th Cir. 2003) (citing *Ins v. Phinpathya*, 464 U.S. 183, 189 (1984) ("noting that in all cases involving statutory construction, our starting point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used")); *Caminetti*

47

*v. United* States, 242 U.S. 470, 485-86 (1917) ("statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them"); *White v. Black,* 190 F.3d 366, 368 (5th Cir. 1999) ("The canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute"). As the Supreme Court has explained, "[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id. See also Thompson*, 337 F.3d at 497 (in applying *Chevron*, court declined to consider legislative history where the statute was clear on its face, noting "we decline to find ambiguity where none exists").

59.    DOL's new Advice Exemption Interpretation does not pass Step 1 of the *Chevron* analysis. DOL's New Rule violates the APA because it is "in excess of the statutory jurisdiction, authority, or limitations, or short of statutory rights." 5 U.S.C. § 706(2)(C).

60.    The LMRDA imposes a reporting obligation on "activities where an object thereof is, directly or indirectly ... to persuade employees" regarding union organizing. 29 U.S.C. § 433(b)(1). The LMRDA also plainly, explicitly, and unambiguously creates an **exemption** from such obligation for "advice.

61.    According to DOL's New Rule, exempt "advice" can never have "an object . . . to persuade." DOL's attempt in its New Rule to treat "advice" under Section 203(c) and "activities where an object thereof, directly or indirectly, is to persuade" under Sections 203(a) & (b) as mutually exclusive concepts is contrary to the statute and ordinary language.

62.     First, even DOL's own definition of "advice" fails to support the agency's conclusion. DOL defines advice as "an oral or written recommendation regarding a decision or a course of conduct." 81 Fed. Reg. 15,939. In ordinary usage, a consultant obviously can make oral and written recommendations regarding an employer's decisions and course of conduct concerning the persuasion of employees about unionizing: *e.g.*, "To lawfully and effectively counter the union's campaign, I, Consultant, recommend that you, Employer, communicate your company's views about the benefits of remaining union-free, prepare your supervisors to respond lawfully and effectively to employee questions, etc., etc." Providing such advice regarding persuasion would self-evidently be an activity falling within the scope of Sections 203(a) & (b) *and* Section 203(c).

63.     Moreover, the Fifth Circuit and the DC Circuit both read the LMRDA as assuming there is an overlap between "advice" on one hand and activities with an object to persuade on the other, contrary to DOL's New Rule.

64.     In *Fowler*, the Fifth Circuit acknowledged the possibility of advice with an object to persuade. Noting that "the Act requires the reporting of any persuasion," the Fifth Circuit added, "[t]hat is, of course, with the exception of those activities covered by § 203(c)." *Fowler*, 372 F.2d at 329 & n.27. The court explained:

> [O]ne can readily conceive of a situation **where the giving of advice could be said to have the object of direct or indirect persuasion.** At first the Department of Labor took the position that the reporting requirements covered an attorney's undertaking to draft speeches, letters, and other written material which are to be delivered or disseminated by the employer to employees for the purpose of persuading them with regard to the exercise of their rights. **Upon reconsideration, the Department conceded that such activities by attorneys, though admittedly intended to have a persuasive effect, came within the 'advice' exemption of § 203(c).** Donahue, Some Problems Under Landrum-Griffin, 1962 Proceedings of ABA Labor Relations Law Section 45.

*Id.* at 329 n.27 (citation omitted; emphasis added). *See also id.* at 330 (noting Section 203(c) was inserted into the LMRDA "to remove from the coverage of § 203(b) those grey areas where the giving of advice . . . could possibly be characterized as exerting indirect persuasion on employees . . .").

65.     The Fifth Circuit has thus recognized that "advice" as used in Section 203(c) can have an object of persuading such that it would be covered by Sections 203(a) and (b) *but for* Section 203(c)'s exemption.   The D.C. Circuit reached the same conclusion. *See UAW),* 869 F.2d at 618 & n.3 (considering "what is the appropriate characterization of activity that can be viewed as both advice and persuasion?" and evaluating "advice [that] has as 'an object' [of] employee persuasion").

66.     By treating "advice" and Persuader Activities as mutually exclusive and without any possible overlap, DOL's new Advice Exemption Interpretation makes Section 203(c) entirely superfluous.   Indeed, DOL improperly reads an exception *into* the statute's advice exemption that is not there, treating it as exempting all advice *except* advice that has an object to persuade.   29 U.S.C. § 433(c).   Because DOL's new interpretation violates basic canons of statutory interpretation, this Court rejects it. *See, e.g., In re Crist*, 632 F.2d 1226, 1233 n. 11 (5th Cir. 1980) (courts should give effect, whenever possible, "to all parts of a statute and avoid an interpretation which makes a part redundant or superfluous."); *Gen. Motors Acceptance Corp. v. Whisnant*, 387 F.2d 774, 778 (5th Cir. 1968) (canons of construction mandate that courts give effect, whenever possible, to all parts of a statute and avoid interpretation that makes a part redundant or superfluous).

67.     Because the plain text of the LMRDA makes "the intent of Congress . . . clear" that an exemption for advice – including advice with an object to persuade – exists, "that is the

end of the matter . . . ."   *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015)

(quoting *Chevron U.S.A. v. Natural Res. Dev. Council*, 467 U.S. 837, 842-43 (1984)).   DOL

"must give effect to the unambiguously expressed intent of Congress" to exempt advice from the

LMRDA reporting requirements and may not nullify that plain-text exemption by an

unauthorized rulemaking. *Chevron.* 467 U.S. at 843.

68.   The Court does not find that the LMRDA is ambiguous in providing an

exemption for advice. 29 U.S.C. § 203(c).   Even if the LMRDA does not provide a precise

definition of advice, it does clearly and unambiguously provide an exception from Sections

203(a) and (b)'s reporting requirements.   DOL's New Rule improperly reads that exemption out

of the statute.

     **b.**     **Plaintiffs and Intervenor-Plaintiffs will likely succeed on their
claim that DOL's new Advice Exemption Interpretation is
arbitrary, capricious, and an abuse of discretion.**

69.   Although the Court does not find the LMRDA ambiguous, the Court also finds

that Plaintiffs would likely succeed on their claim that DOL's New Rule is arbitrary and

capricious.

70.   If the Court were to engage in *Chevron's* Step 2 analysis, it would attach great

weight to DOL's bright-line interpretation of the Advice Exemption that was in effect for more

than fifty years prior to DOL's promulgation of its New Rule.   *See, e.g., Good Samaritan

Hospital v. Shalala,* 508 U.S. 411, 414 and 417 (1993) ("Of particular relevance is the agency's

contemporaneous construction which 'we have allowed . . . to carry the day against doubts that

might exist from a reading of the bare words of a statute". . . . "[T]he consistency of an agency's

position is a factor in assessing the weight that position is due."); *MCI Communications v.

AT&T,* 512 U.S. 218, 229 (1994).

71.     In a new decision striking down another DOL regulation, the Supreme Court explained:

> In explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." It follows that an "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference.

*Encino Motorcars, LLC v. Navarro*, No. 15-415, --- S. Ct. ----, 2016 WL 3369424, at *7 (U.S. June 20, 2016) (internal citations omitted).

72.     The same reasoning applies here. DOL, despite a very lengthy Final Rule, never adequately explains why it is abandoning the prior, longstanding Advice Exemption now. DOL's alleged interest in fostering "transparency" would have existed during the entire lifetime of the LMRDA. DOL does not explain what has changed to require abandoning its prior fifty-plus year old interpretation. DOL does not appear to be cognizant that its longstanding policies may have "engendered serious reliance interests that must be taken into account." *See, e.g. Encino Motorcars*, No. 15-415, 2016 WL 3369424, at *8 (holding "because of decades of industry reliance on the [DOL's] prior policy" DOL's "explanation [for reversing its prior position in a regulation] fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position"). Accordingly, "[t]his lack of reasoned explication for a regulation that is inconsistent with the [DOL's] longstanding earlier position results in a rule that cannot carry the force of law," and "[i]t follows that this regulation does not receive *Chevron* deference in the interpretation of the relevant statute." *Id.* at *9.

73.     In addition, an administrative action is arbitrary and capricious if the promulgating agency fails to "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

74.     Here, DOL did not conduct any studies or independent analysis. DOL has not offered any evidence showing a new alleged need for its dramatically changed rule. *See* 81 Fed. Reg. 15,962.

75.     Moreover, Congress' silence and failure to amend the LMRDA to modify DOL's more than fifty-year-long use of its prior bright-line test strongly suggests Congressional approval of the Advice Exemption interpretation that DOL's New Rule sets aside. *See FDA v. Brown & Williams Co.*, 529 U.S. 120, 156-58 (2000) (Congressional decades-long silence over interpretation by FDA constitutes ratification of rule); *NLRB v. Bell Aerospace*, 416 U.S. 267, 274-75 (1974).

76.     DOL's new Advice Exemption Interpretation is also arbitrary, capricious, and an abuse of discretion because the rule unreasonably conflicts with state rules governing the practice of law. 81 Fed. Reg. 15,991–16,000. DOL's arbitrary conclusions derive from its untenable distinction between "advice" and Persuader Activities. DOL fails to recognize that attorneys providing legal advice may do so with an object to persuade. *See, e.g.*, 81 Fed. Reg. 15,993 (stating incorrectly that "attorneys who restrict their activities to legal services are not required to file any report; only those attorneys who engage in persuader services are required to file a report").

77.     DOL's new Advice Exemption Interpretation conflicts with Section 204 of the LMRDA which exempts from disclosure "any information which was lawfully communicated to such attorney by any of his clients in the course of a legitimate attorney-client relationship." 29

53

U.S.C. § 434.  DOL's New Rule contains reporting requirements that are inconsistent with and undermine the attorney-client relationship and the confidentiality of that relationship.

78.     DOL states that "[i]n the Department's view, none of the information required to be reported under the revised interpretation is protected as a general rule by the attorney-client privilege." 81 Fed. Reg. 15,992.  DOL is plainly incorrect.  DOL has no authority or expertise in the regulation of attorney-client relationships.  The attorney-client relationship is governed by state law.[11]  Both client confidentiality and the attorney-client relationship itself enjoy legal protection under state rules regulating the legal profession.  *See, e.g.*, Tex. Eth. Op. 479, 1993 WL 840538 (1991) (disclosure of clients' names and amounts of fees owed is prohibited by Texas DR 1.05); Pls.' Ex. 31.

79.     Under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct, and Rule 1.6 of the ABA's Model Rules of Professional Conduct, confidential client information that an attorney is barred from disclosing includes both privileged and unprivileged information.  Thus, the boundaries of an attorney's duty of confidentiality exceed the boundaries of the common law attorney-client privilege that Congress codified in Section 204 of the LMRDA.  Tr. (Duffy) at p. 102, line 16 – p. 109, line 19.

80.     Specifically, a lawyer's duty of confidentiality protects from disclosure "all information relating to a client or furnished by the client . . . acquired by the lawyer during the course of or by reason of the representation of the client." Tex. Discipl. R. Prof'l Conduct R. 1.05(a); Pls.' Ex. 28.

---

[11] *See, e.g., In re Dow*, 481 S.W.3d 215, n. 48 (Tex. 2015) ("[T]he authority to regulate the practice of law in Texas belongs exclusively to this Court."); Tex. Gov't Code § 81.011(c) ("The Supreme Court of Texas, on behalf of the judicial department, shall exercise administrative control over the state bar.").

81.     Under an attorney's duty of confidentiality, *inter alia*, the identity of the client is confidential, the fees paid are confidential, and the agreement or arrangement describing the terms of the engagement are confidential. *See* Tr. (Duffy) at 104, 105-06; Pls. Ex. 31.

82.     Under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct, a lawyer may not "[r]eveal confidential information of a client or a former client to . . . anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's law firm" without the client's permission or in other specifically defined circumstances not applicable in this lawsuit. Tr. (Duffy) at 105-06.

83.     DOL's New Rule would also require lawyers, for example in Texas, to violate their duty of loyalty and Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct (regarding conflicts of interest).  DOL's New Rule creates substantial potential conflicts for attorneys with regard to their new, purported obligation to report client information under the LMRDA and their longstanding ethical duty to maintain client confidentially under rules such as 1.05 of the Texas Disciplinary Rules of Professional Conduct and similar rules.  Tr. (Duffy) at 109-116.

84.     DOL's New Rule also would require lawyers to violate Texas Disciplinary Rule of Professional Conduct 2.01 (Advisor), and its counterpart in other States. Rule 2.01 requires that "a lawyer shall exercise independent professional judgment and render candid advice." Tex. Discipl. R. Prof'l Conduct R. 2.01.  For example, absent "rare situations," lawyers cannot ethically give mere technical advice to clients, as DOL recommends to avoid triggering reporting under its New Rule. Tr. (Duffy) at p. 109-116.

85.     DOL asserts that the conflicts its new Advice Exemption Interpretation will create with state ethical requirements can simply be overcome by federal preemption.  81 Fed. Reg.

15,997–15,998.   But the question here is whether it would be arbitrary and capricious of DOL to *create* those conflicts in the first place by adopting its new Advice Exemption Interpretation. Given the historic importance of attorneys' duty of confidentiality, duty of loyalty, the attorney-client privilege and other ethical obligations, there is nothing in the text of the LMRDA that suggests Congress authorized DOL to nullify those duties at its discretion.

86.   DOL also points to an exception in Rule 1.05 that allows a lawyer to reveal unprivileged confidential information "[w]hen the lawyer has reason to do so in order to comply with a court order, a Texas Disciplinary Rules of Professional Conduct, *or other law*." Tex. Discipl. R. Prof'l Conduct R. 1.05(c)(4) (emphasis added).   *See* 81 Fed. Reg. 15,998.   However, because DOL's New Rule likely *exceeds* DOL's authority under the LMRDA, as found above, it likely does not constitute a valid "other law" for purposes of this exception.   To the contrary, DOL's New Rule invalidly purports to require the disclosure of a great deal of "advice" that is actually *protected* from disclosure by the LMRDA in Section 203(c).

> **c.     Plaintiffs and Intervenor-Plaintiffs will likely succeed on their claim that the DOL's new Advice Exemption Interpretation violates free speech and association rights protected by the First Amendment.**

87.   Plaintiffs have also shown a substantial likelihood of success on their claim that DOL's new Advice Exemption Interpretation violates free speech, expression and association rights protected by the First Amendment.

88.   DOL's New Rule imposes content-based burdens on speech and cannot survive strict scrutiny.

89.   It is well settled that employers have a right under the First Amendment to express opinions regarding union organizing.   *See Southwire Co. v. N. L. R. B.*, 383 F.2d 235, 240 (5th Cir. 1967) ("The Supreme Court has made it clear that both sides have the right in a

labor dispute to express opinions . . . . These cases envision free discussion in labor relations including opinions as to the advantages and disadvantages of unions.").

90.     There is also a long-recognized First Amendment right to hire and consult an attorney. *See, e.g., Mothershed v. Justices of the Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005) ("[W]e recognize . . . the 'right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.'" (quoting *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000)); *see also DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult an attorney . . . implicates . . . clearly established First Amendment rights of association and free speech."). Indeed, a lawyer's right to speak on behalf of a client "is almost always grounded in the rights of the client, rather than any independent rights of the attorney." *Eng v. Cooley*, 552 F.3d 1062, 1068 (9th Cir. 2009) (quoting *Mezibov v. Allen*, 411 F.3d 712, 717-18, 720 (6th Cir. 2005)).

91.     The burden on free speech caused by DOL's New Rule is content-based. "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). A regulation is content-based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (citing *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 383 (1964)).

92.     DOL concedes that its New Rule is content based. In the Final Rule, DOL states:

> [R]eporting under both the prior interpretation and this rule rests upon whether the consultant undertakes activities with an object to persuade employees, which is determined, generally, **by viewing the content of the communication** and the underlying agreement with the employer.

81 Fed. Reg. 15,969 (emphasis added).

93.     "[T]he Constitution 'demands that content-based restrictions on speech be presumed invalid . . . and that the Government bears the burden of showing their constitutionality.'" *United States v. Alvarez,* 132 S.Ct. 2537, 2543-44 (2012) (quoting *Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 660 (2004)). Indeed, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 818 (2000). Thus, content-based regulations that prohibit or compel speech are subject to strict scrutiny review. *See Playboy,* 529 U.S. at 813 ("Since § 505 is [a] content-based [speech restriction], it can stand only if it satisfies strict scrutiny.")

94.     Strict scrutiny review requires the Government to prove that the restriction furthers a "compelling interest" and is "narrowly tailored" to achieve that interest. *See, e.g., Playboy,* 529 U.S. at 813 ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest.").[12] In addition, strict scrutiny requires the Government to show that it has used the *least restrictive* means of advancing that allegedly compelling interest. *See id.* at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."); *World Wide Street Preachers Fellowship v. Town of Columbia,* 245 Fed. Appx. 336, 343 (5th Cir. 2007) (unpublished) (*per curiam*) ("If a less restrictive alternative is available, the governmental restriction cannot survive strict scrutiny.").

95.     DOL fails to show that its new Advice Exemption Interpretation satisfies any of these requirements.

---

[12] DOL appears to have understood that the strict scrutiny test would apply to its New Rule. *See* 81 Fed. Reg. at 15,983 (asserting that the New Rule serves "compelling governmental interest[s]").

96.     DOL has not articulated a compelling governmental interest for its new Advice Exemption Interpretation.  DOL has only identified vaguely described, speculative benefits that it believes may result from the New Rule.  DOL's primary purported rationale for its New Rule is that it will provide employees with "essential information about the underlying source of the views and materials being directed at them . . . ." 81 Fed. Reg. 15,926.  DOL asserts that "[t]ransparency [p]romotes [w]orker [r]ights by [c]reating a [m]ore [i]nformed [e]lectorate." 81 Fed. Reg. at 15,932.

97.     DOL has not pointed to any investigation, findings, or studies to show that its alleged interest in "transparency" is compelling or that there would be a causal relation between its New Rule and the speculative outcomes it asserts.  The hypothetical benefits of DOL's New Rule are too speculative and vague to be compelling.

98.     Indeed, the fact that DOL has waited over fifty years to promulgate its New Rule strongly suggests there is no compelling government interest at stake.  DOL has not identified any changed circumstances that mandate government action in service of this alleged interest only now over fifty years after the LMRDA was enacted.

99.     In addition, according to DOL, employee-voters who have access to LM reports filed by attorneys and employers will purportedly be able to make their decisions about how to vote in a union election knowing the true source of the information they are receiving.  For example, DOL reasons:

> Once they have learned that a consultant has been hired to persuade them, employees will be able to consider whether the consultant is serving as a neutral, disinterested third party, hired to guide the employer is adhering to NLRB election rules or rather as one who has been hired as a specialist in defeating union organizing campaigns.

81 Fed. Reg. 15,926.

100.   DOL's rule asserts that the information disclosed in the LM reports "**if known to employees**" may affect "their assessment of the employer's campaign message against [union] representation and their choice whether to support or oppose representation." 81 Fed. Reg. 15983.

101.   However, DOL fails to show that the information disclosed in the LM reports will typically be "known to employees" when they cast their votes.   To the contrary, the undisputed evidence offered at the evidentiary hearing demonstrates otherwise.   Under the NLRB's accelerated election rules, union elections are now typically held about 21 days after the employer receives the Notice of Hearing on the union's election petition. An attorney's LM-20 report is not due until 30 days after being retained by the targeted employer.

102.   DOL asserts that "the rulemaking record suggests that employers engage consultants at the first signs of union organizing, i.e., *before* a petition is filed." 81 Fed. Reg. 15,961. However, DOL fails to cite any evidence in the Final Rule that attorneys are engaged "**before**" a petition is filed."   Indeed, the article cited by DOL in its Final Rule fails to support DOL's position. 81 Fed. Reg. 15,931.

103.   On page 15,931 of the New Rule, DOL states, "[t]ypically at the first sign of union activity at a facility management seeks the advice and counsel of one or more attorneys." According to DOL, evidence to support that statement comes from a 1995 article in the Journal of Labor Research by Bruce Kaufman and Paula Stephan. 81 Fed. Reg. 15,931 (quoting Bruce E. Kaufman & Paula E. Stephan, *The Role of Management Attorneys in Union Organizing Campaigns*, 16 Journal of Labor Research 439 (Fall 1995)).   However, that article does not identify what the authors consider to be the "first sign of union activity." In particular, the article does ___**not**___ state that targeted employers are usually aware of the "first sign of union activity"

***before the election petition is filed with the NLRB***.  Nor is there any suggestion in the article

that attorneys are typically hired pre-petition.  The Court finds DOL's cite at 15,931 to be an

inaccurate and misleading attempt to justify its new Rule, which is not supported by the

"evidence" DOL cites for it.

104.    Indeed, the undisputed evidence presented at the hearing established that

management attorneys are not typically hired until after the targeted employer is notified by the

NLRB of the filing of a union election petition.

105.    In further support of the government's "transparency" interest, DOL's rule

suggests that employee-voters who are "weighing the pros and cons of unionization" will be

interested in knowing "the amount of money an employer actual invests" in opposing the union's

organizing drive. 81 Fed. Reg. 15,989.  In fact, the "amount of money an employer invests" in

resisting a union organizing campaign will not be available to voters because the only source of

that information is the employer's LM-10 report which is not filed until 90 days after the end of

the fiscal year during which the expenditures were made.

106.    The third prong of DOL's asserted "transparency" interest is the assertion that

"employees often are unaware that their employer has hired a consultant . . . and that the

consultant is directing the employer's supervisors to provide a uniform position in opposition to

representation – which may be contrary to the actual views of individual supervisors . . . ." 81

Fed. Reg. 15,983.  In suggesting that giving voice to individual supervisors' "actual views"

regarding the merits of unionization constitutes a compelling governmental interest, DOL

overlooks the Supreme Court's holding in *Florida Power & Light Co. v. IBEW*, 417 U.S. 790,

812 (1974) that an employer "is at liberty to demand absolute loyalty" from supervisors.  It is

settled law that the "discharge of supervisors as a result of their participation in union or

concerted activity – either by themselves or when allied with rank-and-file employees – is *not* unlawful . . . ." *Parker-Robb Chevrolet,* 262 NLRB 402, 404 (1982). *See also Beasley v. Food Fair of North Carolina, Inc.,* 416 U.S. 653, 660 (1974).

107.   Even if the Court were to apply a lower standard of scrutiny, such as the "exacting scrutiny" as suggested by DOL, the New Rule would still fail to satisfy that standard. *See, e.g., Citizens United v. Fed. Elec. Comm'n,* 558 U.S. 310, 366,67 (2010) (applying exacting scrutiny to disclosure rules).   Under that standard, there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest. *Id.*   As set forth above, DOL has not shown such a relation because it has not shown that the newly required disclosures will typically occur *before* employees vote.  To the contrary, such disclosures will generally occur only after voting has occurred, often *long* after voting is over.

108.   DOL's new Advice Exemption Interpretation also is not narrowly or reasonably tailored.  As found above, DOL's New Rule, including its revision of reporting requirements under Forms LM-10 and LM-20, effectively eliminates the Advice Exemption from the LMRDA.  Many activities that are ordinarily performed by an employer's attorneys, such as drafting documents and communications that an employer may decide to provide to its employees, the training of supervisory employees, and the drafting of employment policies will for the first time be regarded as Persuader Activities triggering reporting obligations.  DOL's revised Form LM-10 requires employers to disclose "each activity performed or to be performed," the "[p]eriod during which performed," and the "[e]xtent performed," and it lists thirteen categories of activities that trigger reporting obligations, including the vague category of "other." *See* 81 Fed. Reg. 16,038.  DOL's revised Form LM-20 contains similar reporting obligations. *See* 81 Fed. Reg. 16,051.  Section 203(b) and LM-21 impose even broader

disclosure requirements applicable to *all* clients for "labor relations advice or services" once a reporting obligation is triggered.

109.    There is no showing that Congress intended with the LMRDA to require reporting with respect to all such activities.  To the contrary, Section 204 of the LMRDA indicates the exact opposite.  DOL's New Rule is far too broad and captures much activity that the LMRDA intends to exclude.

110.    DOL has also not shown that it has used the least restrictive means of advancing its purported interests.  To the contrary, DOL has for decades interpreted the Advice Exemption to exclude from the LMRDA's reporting requirements an employer's engagement of a consultant, including an attorney, to assist the employer when responding to union organizing so long as the consultant had no direct contact with the employees to be persuaded and the employer was free to accept or reject the consultant's recommendations.  Clearly, DOL's prior interpretation was less restrictive than its new interpretation.  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.

111.    In addition, laws that inhibit or burden the exercise of First Amendment rights can be invalidated under the overbreadth doctrine.  *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  This is true even if the Government has not directly restricted speech.  *See generally Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 399 (1950) (recognizing regulation that results in indirect abridgment of speech may run afoul of the First Amendment).

112.    Under the overbreadth doctrine, "[t]he showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or

partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal citations omitted).

113.   The Supreme Court "provided this expansive remedy [*i.e.,* suspending all enforcement of an overbroad law] out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Id*. As noted by the Court, "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech." *Id*. "Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech." *Id*.

114.   Evidence shows that if the broad disclosure requirements of Section 203(b) and the LM-21 Form are applied to attorneys and employers under the DOL's New Rule, there is a substantial risk that attorneys will cease providing certain advice, including some legal advice, and that employers would cease to seek it. Such an outcome burdens and "chills" employers' First Amendment rights.

115.   For the reasons already set forth above, Plaintiffs have shown a likelihood of success on their claims under the First Amendment.

> **d.   Plaintiffs and Intervenor-Plaintiffs will likely succeed on their claim that DOL's new Advice Exemption Interpretation is unconstitutionally vague in violation of the due process clause of the Fifth Amendment.**

116.   Plaintiffs have also shown a substantial likelihood of success on their claim that DOL's new Advice Exemption Interpretation is void-for-vagueness under the Due Process Clause of the Fifth Amendment.

117.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Thus, regulations must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* Further, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012).

118.    Accordingly, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Koldender v. Lawson*, 461 U.S. 352, 357 (1983). Moreover, "[w]hen speech is involved, *rigorous* adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC*, 132 S.Ct. at 2317 (emphasis added). *Accord Vill. Of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982) ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. **If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.**") (emphasis added).

119.    Here, DOL replaced a long-standing and easily understandable bright-line rule with one that is vague and impossible to apply. DOL's New Rule provides that reporting is triggered when a "consultant who has no direct contact with employees" undertakes activities "with an object to persuade employees." 81 Fed. Reg. 15938.

120.    DOL defines **"object to persuade"** as communications with supervisors, preparation of materials, speeches, and development of personnel policies that "explicitly or *implicitly*" reference unions and "*affect* employees' exercise of their rights."  81 Fed. Reg. 15,970 (emphasis added).

121.    Use of words like "implicit" and "affect" are too broad to produce any certainty or consistency in application of the "object to persuade" standard that triggers the reporting obligations under DOL's New Rule.  Further, many activities that are ordinarily performed by an employer's attorneys, such as drafting documents and communications on behalf of an employer that an employer may decide to provide to employees, the training of supervisory employees, and the drafting of employment policies can easily for the first time be regarded as Persuader Activity triggering reporting obligations.

122.    For example, DOL states that lawyers who advise employers about legal requirements have no reporting obligation, but if they do so while at the same time revising employer communications to employees to make them more persuasive, reporting is required. 81 Fed. Reg. 15937-38.  With these statements, DOL is attempting to "segment a process that's really not segmentable."  Tr. (Meisburg) at 205.

123.    Again, the defect derives from DOL's attempt to treat "advice" and activities with an object to persuade as mutually exclusive.  Because that distinction is inconsistent with the LMRDA and with actual practice, the New Rule fails to provide reasonable guidance regarding what activities trigger reporting.

124.    In this regard, the *Labnet* court observed:

DOL had trouble [at oral argument] explaining when and why revising an employer-drafted document is reportable under its interpretation of § 203(c). Hr'g Tr. 57-59.  Suppose that an employer asks its attorney to edit a draft of a memorandum that the employer intends to send to its employees to persuade them

not unionize. If the attorney corrects spelling errors, has the attorney engaged in reportable persuader activity? What if the attorney corrects grammatical mistakes? Suggests replacing passive verbs with active verbs, so that the document will be more persuasive? Suggests a font that is easier on the eyes so that employees will be more likely to read the document? Suggests inserting one word in one sentence? Suggests inserting a few words in a few sentences? Suggests inserting a few sentences? It seems pretty clear that DOL considers correcting spelling errors to be non-reportable advice, and adding words or sentences to be reportable persuader activity, but it is not at all clear how DOL comes to this conclusion.

DOL contends that its interpretation of § 203(c) is sound notwithstanding the fact that it has difficultly applying that interpretation to certain hypothetical scenarios. But the Court's questions did not involve exotic scenarios or outlier cases; the Court asked DOL about the sort of bread-and-butter work that lawyers perform for clients every single day. DOL's difficulty answering the Court's questions reflects not the inevitable ambiguities that arise when applying a reasonably clear principle to marginal cases, but rather the untenability of DOL's central position that persuader activity can never be advice, and advice can never be persuader activity.

*Labnet, slip op.* at 17-18.

125.   As found above, DOL's New Rule is not authorized by the LMRDA and eliminates its Advice Exemption. If an employer, consultant, or attorney attempts to apply his or her own understanding of exempt advice based on the plain language of the LMRDA and based on actual practice, he or she will in many instances have to choose between following the statute or following the DOL's New Rule. Presumably if that employer, consultant, or attorney chooses to follow the LMRDA rather the DOL's New Rule, that would be a "willful" violation of the New Rule, exposing the employer, consultant, or attorney to potential criminal investigation and prosecution under 29 U.S.C. § 439.

126.   Under DOL's New Rule, there is a substantial risk that associations, employers and consultants, including attorneys, will not be able to determine with reasonable certainty whether their actions require reporting.

127. Plaintiffs and Intervenor-Plaintiffs have shown that they are likely to succeed on their claim that DOL's New Rule is void for vagueness.

### e. Plaintiffs and Intervenor-Plaintiffs will likely succeed on their claim that DOL's new Advice Exemption Interpretation violates the Regulatory Flexibility Act (RFA).

128. Plaintiffs have also shown a substantial likelihood of success on their claim that DOL's new Advice Exemption Interpretation violates the RFA.

129. The RFA requires an agency that has proposed a rule to prepare and make available for public comment an initial and final regulatory flexibility analysis. The initial flexibility analysis "shall describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The final regulatory flexibility analysis, which is provided in connection with the promulgation of a final rule, requires a description of (i) "the reasons why action by the agency is being considered," (ii) "a succinct statement of the objectives of, and legal basis for, the proposed rule," (iii) "a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply," and (iv) "a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." 5 U.S.C. § 603(b)-(c) (2012).

130. An agency can avoid performing these analyses if the head of the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. 5 U.S.C. § 605 (2012).

131. DOL certified that its new and constricted Advice Exemption Interpretation would not have a significant economic impact on a substantial number of small entities. 81 Fed. Reg. 16,015.

132.     Plaintiffs have made a substantial showing that DOL, in making this certification, understated the economic impact of its New Rule, that it failed to provide an adequate factual basis for its cost estimates, and that it failed to meaningfully consider and address the weight of the comments and cost estimates submitted in response to proposed rulemaking.

133.     As indicated above, the LMRDA imposes three separate reporting requirements. First, a consultant, including an attorney, who is engaged by an employer to engage in Persuader Activity must file a Form LM-20 report within thirty days of entering into such a relationship. 29 U.S.C. § 433(b) (2012).  Second, an employer who engages in any such arrangements must file a Form LM-10 year-end report covering all such activities for the past year.  *Id.* § 433(a). Third, a consultant who has engaged in any covered activities must also file a year-end Form LM-21 report, which must detail his receipts and disbursements in connection with his work.  *Id.* § 433(b).

134.     DOL's New Rule changes what associations, employers, and consultants, including attorneys, must report.  DOL failed to consider the ramifications that its New Rule would have on consultants, including attorneys, who are required to complete and file Form LM-21.  Instead, DOL left such concerns to a separate rulemaking, which it estimates will give rise to a new proposed rule concerning Form LM-21 in September 2016.  81 Fed. Reg. 15,992 & n.88.

135.     Agencies may not enact "a rule that utterly fails to consider how the likely future resolution of crucial issues will affect the rule's rationale."  *Nat'l Ass'n of Broadcasters v. F.C.C.*, 740 F.2d 1190, 1210 (D.C. Cir. 1984).  Further, "an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future."  *ITT World Commc'ns, Inc. v. F.C.C.*, 725 F.2d 732, 754 (D.C. Cir. 1984).

136.    Here, DOL artificially excluded important costs of its implementation from consideration (i.e., the increased cost of complying with Form LM-21's requirements under the New Rule) by deferring consideration of such costs until such time as it engages in Form LM-21 rulemaking.  DOL has structured its decision-making in such a way that it "entirely failed to consider an important aspect of the problem." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

137.    DOL calculated that the average cost of employer compliance with its new and constricted Advice Exemption Interpretation is $107.68.  DOL states that the total cost of its New Rule is an insignificant 0.24% "of a consultant's average annual gross revenue." 81 FR 16,018.

138.    A more recent study performed by the former Chief Economist for the Department of Labor estimated that the total burden for the first year would be between $7.5 billion and $10.6 billion, with subsequent annual costs amounting to between $4.3 billion and $6.5 billion. The total cost over a ten-year period could be $60 billion.  Diana Furchtgott-Roth, *The High Costs of Proposed New Labor-Law Regulations*, MANHATTAN INSTITUTE (Jan. 27, 2016), available at http://www.manhattan-institute.org/html/high-costs-proposed-new-labor-law-regulations-5715.html (last accessed April 7, 2016); Tr. 33, 81, Pls.' Ex. 5.

139.    Moreover, uncontroverted evidence presented at the hearing demonstrates that the costs to be incurred by some law firms to comply with the New Rule will be substantial.  It does not appear that DOL considered such costs.

140.   Plaintiffs have made a substantial showing that DOL's New Rule will impose a significant economic impact on a substantial number of small businesses and that DOL failed to conduct a proper regulatory flexibility analyses.

**2.     Plaintiffs and Intervenor-Plaintiffs have shown a substantial threat of irreparable harm.**

141.   Plaintiffs and Intervenor-Plaintiffs would suffer irreparable harm in the absence of injunctive relief.

142.   An irreparable injury is one which cannot be remedied by an award of economic damages. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981).  It is "a fundamental principle of preliminary injunctions" that "[a]n injunction is of no help if one must wait to suffer injury before the court grants it." *Texas v. U.S.*, 809 F.3d at 173 n.137.  It is also well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2948.1 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

143.   Moreover, with respect to the Intervenor-Plaintiffs, "whenever an enactment of a state's people is enjoined, the state suffers irreparable injury." *Texas*, 95 F. Supp. 3d at 981.

144.   Here, Plaintiffs have shown there is a substantial threat that DOL's New Rule will cause irreparable harms to them, their members, and other employers, including by:

- Reducing access to full, complete, un-conflicted legal advice and representation relating to unionization campaigns;

- Reducing access to training, seminars, information, and other advice relating to unionization campaigns; and

- Burdening and chilling First Amendment rights, including the right to express opinions on union organizing and to hire and consult with attorneys.

145.   As set forth above, DOL's New Rule creates conflicts with attorney ethical rules by requiring the disclosure of advice, including legal advice from attorneys to clients, and the disclosure of attorney-client relationships and arrangements.

146.   The overarching purpose of an attorney's duty of confidentiality is to guarantee the proper functioning of the attorney-client relationship. Tr. (Duffy) at 131-33. If clients are not assured of confidentiality in their communications with their attorneys, clients will not be able to fully inform their attorneys and obtain the full benefits of the legal system. Tr. (Duffy) at 131-32. Without confidentiality, those who need attorneys will not seek them out, thereby harming not only their interests, but the system of justice. Tr. (Duffy) at 133.

147.   Under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct, and Rule 1.6 of the ABA's Model Rules of Professional Conduct, confidential client information that an attorney is barred from disclosing includes both privileged and unprivileged information. Tr. (Duffy) at 103-04; Pls.' Exs. 28, 30. Therefore, the boundaries of an attorney's duty of confidentiality exceed the boundaries of the common law attorney-client privilege. Tr. (Duffy) at 103-04. Specifically, a lawyer's duty of confidentiality protects from disclosure "all information relating to a client or furnished by the client . . . acquired by the lawyer during the course of or by reason of the representation of the client." Tex. Discipl. R. Prof'l Conduct R. 1.05(a); Pls.' Ex. 28. Thus, under an attorney's duty of confidentiality, the identity of the client is confidential, the fees paid are confidential, the agreement or arrangement describing the terms of the engagement are confidential. Tr. (Duffy) at 104, 105-06; Pls.' Ex. 31. Under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct, a lawyer may not "[r]eveal confidential

information of a client or a former client to . . . anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's law firm" without the client's permission or in other specifically defined circumstances not applicable in this lawsuit. Tex. Discipl. R. Prof'l Conduct R. 1.05(b)(1)(ii); Pls.' Ex. 28; Tr. at 106.

148. The duty of confidentiality places the attorney in a fiduciary capacity. Tr. (Duffy) at 119-20, 128-29, 131-32, 133-34. Thus, like the confidentiality rules codified across the country, the Texas Disciplinary Rules of Professional Conduct recognize:

> Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidential information of one who has employed or sought to employ the lawyer. Free discussion should prevail between lawyer and client in order for the lawyer to be fully informed and for the client to obtain the full benefit of the legal system. The ethical obligation of the lawyer to protect the confidential information of the client not only facilitates the proper representation of the client but also encourages potential clients to seek early legal assistance.

Tex. Discipl. R. of Prof'l Conduct R. 1.05 cmt. 1; Pls.' Ex. 28.

149. DOL's New Rule conflicts with the promulgated rules of every State regarding an attorney's ethical obligation to maintain client confidences. Tr. (Duffy) at 99-101. The reporting requirements of DOL's New Rule invade what every State has codified as foundational to its administration of justice: attorney-client confidentiality. Tr. (Duffy) at 106-07. The New Rule conflicts with state rules imposing upon attorneys the fiduciary duty to maintain as confidential privileged and unprivileged information, and requires the disclosure by attorney advisors of confidential information. *Id.* Specifically, DOL forms LM-20 and LM-21 require a lawyer who has engaged in what DOL now considers persuader activity to produce "unprivileged confidential information," in violation of Texas Disciplinary Rule of Professional Conduct 1.05. *Id.*

73

150.    The New Rule also creates conflicts, for example, for lawyers in Texas, with their duty of loyalty and Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct (regarding conflicts of interest).   This is because a lawyer cannot accept the representation of a client "where the lawyer reasonably believes that the representation of that client would be affected by, among other things, the lawyer's own--or the lawyer's firm's own interests." Tr. (Duffy) at 110.

151.    Under DOL's New Rule, a knowing, consensual disclosure as to one client may trigger an unknowing, non-consensual disclosure concerning a prior client.   This functionally rewrites the duty of loyalty in that an attorney cannot disclose a conflict to a past client after-the-fact.   "[T]he whole point of the conflict of interest rules is that clients ought to be able to go into a situation and an engagement with their eyes open about all of the potential consequences, including the unintended consequences, and one of those unintended consequences is, you might find your name in a Department of Labor form under circumstances that you might prefer not to have that disclosed." Tr. (Duffy) at 111.

152.    Under DOL's New Rule, a consultant, including an attorney, may only counsel an employer with regard to whether something is "lawful" to be assured of avoiding the LMRDA's disclosure requirements.   The consultant can also provide or revise examples or descriptions of statements found by the NLRB to be lawful, without incurring reporting obligations.   However, if the attorney's revision is intended to increase the persuasiveness of the materials, apparently even if "lawfully persuasive," then a reporting requirement is triggered. 81 Fed. Reg. 15939; Pls.' Ex. 1. Mr. Duffy opined that this provision of DOL's New Rule conflicts with attorneys' ethical duties because an attorney cannot "identify the dividing line between attorney advice in the sense that the DOL is referring to it that doesn't trigger a reporting obligation from that that does in the context of a dynamic situation. . . . [F]or lawyers who actually represent clients, you have to

74

understand that you have a dynamic situation. It's not a let's talk about what the pristine law is; then we will talk about making decisions about that law; and now we'll talk about what the consequences of what you have done are." Tr. (Duffy) at 112-13.

153.    DOL's New Rule also would conflict with Texas Disciplinary Rule of Professional Conduct 2.01 (Advisor), and its counterpart in other States. Rule 2.01 requires that "a lawyer shall exercise independent professional judgment and render candid advice."  Tex. Discipl. R. Prof'l Conduct R. 2.01.

154.    Mr. Duffy opined that this requirement means that an attorney must "provid[e] all of the parameters that are relevant to the issue that the client is asking you about or seeks guidance on and to go beyond the mere, well, this is the law, to actually actualizing it for the client." Tr. (Duffy) at 116.  Comment 1 of that rule is clear that "[a] client is entitled to straightforward advice expressing the lawyer's honest assessment." Tex. Discipl. R. Prof'l Conduct R. 2.01 cmt. 1. Moreover, "[a]dvice couched in narrow legal terms may be of little value to a client, especially where practical considerations, such as costs or effects on other people, are predominant. Purely technical legal advice, therefore, can sometimes be inadequate." Tex. Discipl. R. Prof'l Conduct R. 2.01 cmt. 2.

155.    In employment, unionization, and collective bargaining matters, Mr. Duffy's expert opinion is that "[p]urely technical legal advice" is inadequate and that DOL's New Rule would require attorneys to violate their duty to be full "Advisors" to their clients. Tr. at 117-18. For example, Mr. Duffy testified as follows:

> [I]f the position of DOL is that one avoids the triggering event by limiting your advice to what I'll call hornbook law--here's the law: Thou shall not intimidate, thou shall not do X, Y, and Z-- and that I'll stay away from everything else, you're going to bump up against your obligation to provide candid advice to the client, which also includes non-law, unintended consequences of a course of action.

Tr. (Duffy) at 117.

156.   In Mr. Duffy's opinion, absent "rare situations," lawyers cannot ethically give mere technical advice to clients, as DOL recommends. Tr. (Duffy) at 136-37. This is because "there are other potential, unintended consequences" and "many a client's legal activities have other effects that they may not have thought about." Tr. (Duffy) at 138. The "candid advice" contemplated by the rules includes advice that would trigger reporting under DOL's New Rule, and yet that advice must be simultaneously preserved as confidential under both an attorney's ethical obligations and the plain language of the Advice Exemption to the LMRDA.

157.   DOL states:

> "Information concerning client motives related to the persuasion of employees" is reportable and disclosures "might reveal employers' motivations, business strategies, the advice sought or the specific nature of the legal services provided."

81 Fed. Reg. 15,995.   According to Mr. Duffy, this very information that DOL notes attorneys will receive from clients is attorney-client privileged and confidential information, and must be protected. To disclose it would violate an attorney's ethical duties. Tr. (Duffy) at 119-20.

158.   As noted above, DOL states:

> Attorneys who have an ethical reservation about their obligations under the rule to report information about their clients always have the option to choose to decline to provide persuader services to clients who refuse to provide consent to disclose the required information and limit services to legal services which do not trigger reporting in any event.

81 Fed. Reg. 15,998 n. 93.   Mr. Duffy opined that "[i]n practical terms, this is completely unworkable, because largely where the line is usually going to be determined after the breach has occurred, or at least the accused failure to disclose. That's the problem with not having a bright line, that is, you won't know it until the DOL sees it and charges you with not disclosing." Tr. (Duffy) at 120-21.

159.    Under DOL's New Rule, Mr. Duffy opined that employers will be less likely to seek legal help during union organizing, because employers will not want to report (and reports will be public); also, employers will not want to be reported by their lawyers. Tr. at 122-23.

160.    DOL relies on *Price v. Wirtz*, 412 F.2d 647 (5th Cir. 1969) to support its conclusion that client identity and fees paid to a lawyer are not confidential. But this authority is inapposite. In *Wirtz*, lawyers were engaged ***to make direct contact with rank and file employees for persuasion purposes.*** That fundamental distinction removed them from acting in the capacity of a lawyer. Tr. (Duffy) at 126-27. *See In re Tex. Farmers Ins. Exch.*, 990 S.W.2d 337 (Tex. App.-Texarkana 1999, no writ) (attorney-client privilege does not apply where attorney was acting in any capacity other than that of an attorney, such as an investigator); *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1970) (attorney's status as an investigator prevents communications from being protected by the attorney-client privilege). *Wirtz* also was decided under DOL's 50+ year bright line rule and not DOL's New Rule, which greatly broadens the activities that trigger reporting to include "legal advice" and thus fundamentally changes the ethical calculus.

161.    Mr. Robinson similarly testified that Rule 1.06 of the ABA Model Rules of Professional Conduct generally provides that an attorney has an obligation to treat client information and communication as confidential and can only disclose that with informed consent from the client. Tr. (Robinson) at 160. Under Model Rule 1.06, the following are confidential and cannot be disclosed by a lawyer without client consent:

- Identity of client
- Identity of nature of client relationship
- Fees paid
- Representation Agreement/Arrangement and its "terms and conditions"
- Scope of Services or activities undertaken by the lawyer

162.   DOL Forms LM-20 and LM-21, mandated by DOL's New Rule, call for disclosure of all this information.   Mr. Robinson also opined it would be a violation of a lawyer's ethical obligations to disclose the above items on these forms.   Tr. (Robinson) at 162.

163.   DOL states:

> Associations and consultants, including attorneys, who advise employers about legal requirements have no reporting obligation, but if they do so while at the same time revising an employer communication to employees to increase the persuasiveness of the communication (a traditional role of consultants, including attorneys), it is reportable under DOL's new rule.

81 Fed. Reg. 15,937-38.

164.   ABA Model Rule 2.01 is known as the "Advisor Rule" and provides that in representing a client, a lawyer shall exercise independent professional judgment and render candid advice.   In rendering advice, a lawyer may refer not only to the law, but to other considerations, such as moral, economic, social and political factors that may be relevant to the client's situation.   Tr. (Robinson) at 162.

165.   Mr. Robinson also opined that the new DOL Rule is not consistent with the obligations of lawyers under Model Rule 2.01 "because it causes the attorney to be less than independent in the advice that the attorney will give".   Tr. (Robinson) at 163.   He testified further that "[t]he attorney, to be ethical, in my opinion, to be in compliance with the rules, would have to, before even consulting with the client, advise the client that there is this potential of having to report all or some aspects of the conversation to the extent that the conversation could be interpreted or described as having an object to persuade."   Tr. (Robinson) at 163.

166.   As noted above, in the Final Rule, DOL states that attorneys who have ethical reservations about reporting confidential information "always have the option to choose to decline to provide persuader services ... and limit services to legal services."   81 Fed. Reg.

15,998. The problem with DOL's approach, however, is that some "persuader services" *__are__* legal services. Thus an attorney can only avoid the New Rule's disclosure requirements by also declining to provide *__some legal services__*, which severely burdens those clients who need such services.

167.    Indeed, Plaintiffs have shown that there is a substantial likelihood that many attorneys will no longer be available and willing to offer legal advice to employers relating to union campaigns as a result of DOL's New Rule.  For example, Don Graf, who is the only management-side attorney in the Lubbock, Texas area with union election experience, states that he will cease providing such services under the DOL's New Rule.  On the national level, large and well-known firms such as Morgan Lewis have already started announcing that they are making the same choice to cease providing some services to avoid the New Rule's disclosure requirements.

168.    The evidence at the hearing shows that employers need such advice.  For example, employers often require legal advice to respond to union election petitions, which impose numerous legal obligations on employers.  Many employers – especially, smaller employers – lack in-house counsel, human resources staff, or other expertise in such matters. Under the NLRB's current election rules, which impose numerous relatively short deadlines, an employer's ability to quickly access competent legal counsel is vital to ensuring legal compliance.

169.    By threatening Plaintiffs', their members', and other employers' access to legal and other advice, the New Rule also threatens irreparable harm by interfering with First Amendment rights, as set forth above.

170.    Injunctive relief is necessary to prevent such irreparable harm.  The evidence presented at the hearing demonstrates that DOL's New Rule will deter employers from seeking counsel and exercising their free speech rights.  In addition, attorneys will be deterred from advising employers where that advice might under DOL's New Rule be deemed to trigger reporting despite the LMRDA's Advice Exemption.

171.    Moreover, under DOL's New Rule, businesses and consultants, including attorneys, will be required to publicly disclose information – including information considered confidential and/or privileged – which once disclosed, cannot be taken back.

172.    The chilling of speech protected by the First Amendment is in and of itself an irreparable injury.  *See Henry v. Lake Charles American Press, L.L.C.,* 566 F.3d 164, 180 (5th Cir. 2009) ("[T]he loss of First Amendment freedoms, for even minimal periods time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns,* 427 U.S. 347, 373, (1976)); *Wilson v. Thompson,* 593 F.2d 1375, 1383 (5th Cir. 1979) ("When a significant chilling effect on free speech is created by a bad faith prosecution, the prosecution will thus as a matter of law cause irreparable injury regardless of its outcome, and the federal courts cannot abstain from issuing an injunction."); *35 Bar & Grille, LLC v. City of San Antonio,* 943 F. Supp. 2d 706, 724 (W.D. Tex. 2013) (holding that "[b]ecause the requirement that dancers wear bikini tops deprives Plaintiffs of their First Amendment rights, Plaintiffs have shown irreparable harm").

173.    Indeed, courts in this Circuit have found that laws that place significant burdens on the exercise of Constitutional rights or alternatively require citizens to forgo them constitute irreparable harm.  *See, e.g., Planned Parenthood of Cent. Tex. v. Sanchez,* 280 F. Supp. 2d 590, 611 (W.D. Tex. 2003) ("[T]he Plaintiffs and their patients will suffer irreparable harm if the Plaintiffs do sign the TDH affidavit, because the Plaintiffs will not be able to assist women in

obtaining safe abortions, and patients seeking abortion services will be forced to travel long distances, travel to Mexico, delay obtaining an abortion, resort to unsafe methods of abortion, or forgo their constitutionally protected right.").

174.    In addition, Intervenor-Plaintiffs have no adequate remedy at law to contest the application of the Final Rule. By forcing state officials, through the rules of ethics and professional conduct that they administer, to choose between a federal rule or complying with State law, the Rule causes an irreparable injury. *See Texas*, 95 F. Supp. 3d at 981 ("[B]y forcing state officials to choose between violating a federal rule to comply with Texas law, and vice versa, the Rule causes an irreparable injury."); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997)("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people . . . is enjoined.").

175.    DOL's New Rule is not merely fuzzy around the edges.  Rather, the New Rule is defective to its core because it entirely eliminates the LMRDA's Advice Exemption.    In whatever manner DOL defines "advice," it must do so consistent with the statute and therefore must actually exempt advice, *including advice that has an object to persuade*.  The New Rule not only fails to do that, it does the exact opposite: it nullifies the exemption for advice that relates to persuasion.    The New Rule therefore fails to provide notice to employers, lawyers, and consultant of what activities relating to persuasion are covered by the Advice Exemption.[13]  Such

---

[13] For example, the LM-10 Form to be completed by employers identifies thirteen (13) categories of Persuader Activities. 81 Fed. Reg. 16,308. Many of these on their face fall within the Advice Exemption, such as "[d]eveloping personnel policies."    Moreover, the thirteenth catchall category is merely "Other," which provides no guidance at all.  The LM-20 Form for consultants

advance notice is necessary to allow employers, lawyers, and consultants to order their affairs accordingly. As demonstrated by the evidence in this case, many employers, lawyers and trade associations want to avoid engaging in activities that trigger reporting under the LMRDA for various reasons, including due to their ethical obligations and their privacy concerns. Moreover, as a criminal statute, LMRDA must provide fair notice of what conduct is required and prohibited. The New Rule, which is contrary to the LMRDA, completely fails to do that. It leaves employers, lawyers, consultants, and trade associations – not to mention unions, employees, DOJ prosecutors, DOL investigators, and other interested parties – to guess what activities with an object to persuade fall within the LMRDA's Advice Exemption.

176.   For all these reasons, Plaintiffs and Intervenor-Plaintiffs have shown a substantial threat of irreparable harm. [14]

### 3.   The balance of hardships weighs in Plaintiffs' and Intervenor-Plaintiffs' favor.

177.   The threatened injury to Plaintiffs and Intervenors outweighs any threatened harm to DOL.

178.   The threatened injury to Plaintiffs and Intervenors as set forth above is substantial, including the risk of deprivation of counsel and burdening constitutional rights. In

---

includes the same list but adds a category for "seminars.' 81 Fed. Reg. 16,051.

[14] In *Labnet*, the court did not find a threat of irreparable harm. However, in that case, the plaintiffs are attorneys, and the focus was on whether those *attorneys* were threatened by irreparable harm under the New Rule. Here, the Plaintiffs are trade associations, and the focus is on whether they and their employer-members have shown a threat of irreparable harm. That is a different question, which the *Labnet* court did not consider. There also was no evidentiary hearing in that case. In contrast, this Court heard testimony from eight (8) witnesses, including representatives of three trade associations, one local Lubbock-based employer, and multiple attorneys and experts. As set forth above, this evidence demonstrates a substantial threat of irreparable harm to employers and trade associations under the New Rule.

addition, the Intervenors' threatened injury to the exercise of their police powers under the Constitution to regulate the practice of law is substantial.

179.    On the other hand, DOL will suffer no harm from delayed implementation. First, it is likely the New Rule exceeds DOL's authority. There is no harm in delaying implementation of an invalid rule. *Cf., Bayou Lawn & Landscape Services v. Secretary of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013) ("DOL argues that it is harmed by having 'its entire regulatory program called into question.' This is not an appealing argument. If the 'entire regulatory program' is *ultra vires*, then it should be called into question.").

180.    Moreover, even in the event DOL's New Rule were upheld on the merits, DOL has not shown that delaying implementation would cause any harm. A preliminary injunction would merely maintain the status quo that has been in place for the past half-century. Indeed, DOL itself took five years between the time it proposed the New Rule in 2011 until it finalized it in 2016. Further delay pending the outcome of this case will cause no harm.

### 4.    The issuance of the preliminary injunction will not disserve the public interest.

181.    For all of the reasons set forth above, a preliminary injunction would serve the public interests. A preliminary injunction would ensure that Plaintiffs, their members, and other employer will continue to have access to necessary legal counsel, protect confidential relationships, and protect constitutional rights.

### C.    A nationwide injunction is appropriate.

182.    This Court has jurisdiction to grant injunctive relief under Fed. R. Civ. P. 65.

183.    "The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *California v. Yamaski*, 442 U.S. 682, 702 (1979).

184.   This Court has jurisdiction to enter an injunction against Defendants on a nationwide basis. *See Texas*, 809 F.3d at 188 ("[T]he Constitution vests the District Court with 'the judicial power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction").

185.   Plaintiffs and Intervenor-Plaintiffs have shown that a nationwide injunction is appropriate.

186.   First, a nationwide injunction is proper because this case presents a facial challenge that maintains DOL's New Rule is invalid because, among other reasons, it is inconsistent with the LMRDA and exceeds the DOL's authority. Where a party brings a facial challenge alleging that agency action violated APA procedures, a nationwide injunction is appropriate. *See, e.g., Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407-08, 1409 (D.C. Cir. 1998) (invalidating rule and enjoining Army Corps from nationwide application); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

187.   In addition, Plaintiff NFIB has shown that it is a nationwide organization which has members in all 50 states. Tr. 245, lines 7-9. NFIB's members would be subject to DOL's New Rule in every jurisdiction.

188.   Finally, Intervenor-Plaintiffs consist of multiple states in addition to Texas, including, State of Arkansas, State of Alabama, State of Indiana, People of Michigan, State of Oklahoma, State of South Carolina, State of Utah, State of West Virginia, and State of Wisconsin. They, too, would be subject to DOL's New Rule in other jurisdictions.

189.    Because the scope of the irreparable injury is national, and because the DOL's New Rule is facially invalid, the injunction should be nationwide in scope.

190.    To the extent any of the foregoing Conclusions of Law should more properly be denominated as Findings of Fact, they are hereby deemed to be such.

### ORDER GRANTING INJUNCTIVE RELIEF

Based upon the foregoing Findings of Fact and Conclusions of Law, and the Court having found that Plaintiffs and Intervenor-Plaintiffs have satisfied all the necessary elements to maintain a lawsuit and to obtain a Preliminary Injunction hereby grants Plaintiffs' and Intervenor-Plaintiffs' Application (Motion) for Preliminary Injunction.  The United States of America, its departments, agencies, officers, agents and employees, including Thomas E. Perez, Secretary of the United States Department of Labor, and Michael J. Hayes, Director of the Office of Labor-Management Standards, are hereby enjoined on a national basis from implementing any and all aspects of the United States Department of Labor's Persuader Advice Exemption Rule ("Advice Exemption Interpretation"), as published in 81 Fed. Reg. 15,924, *et seq.*, pending a final resolution of the merits of this case or until a further order of this Court, the United States Court of Appeals for the Fifth Circuit or the United States Supreme Court.  The scope of this injunction is nationwide.

The Court will issue a scheduling order setting pretrial deadlines and a trial date in the near future.

The Court has considered the issue of security per Rule 65(c) of the Federal Civil Rules of Procedure.  It finds that the Defendants will not suffer any financial loss that warrants the need for the Plaintiffs to post security.  The Fifth Circuit has held that a district court has the discretion to "require no security at all" and the Court hereby exercises that authority based upon the facts and circumstances of the case, the issues being decided and the parties involved.

*Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996); *see also Corrigan Dispatch Co. v. Casa Guzman, SA.,* 569 F.2d 300 (5th Cir. 1978); Wright & Miller, *Federal Practice and Procedure,* § 2954.

SO ORDERED.

SIGNED this _____27th_____ day of _____June_____, 2016.

_____
SAM R. CUMMINGS,
UNITED STATES SENIOR DISTRICT JUDGE

86